## APPEAL OF MANHATTAN BREWING CO.

Docket No. 693.    Promulgated April 22, 1927.

1. A brewing corporation lost much of the value of its tangibles and all the value of intangibles as a result of national prohibition legislation. *Held,* that the obsolescence of tangibles so sustained is deductible from gross income when proved as to amounts and properly allocated as to time, and that obsolescence of its intangibles is not so deductible.

2. The petitioner sold tangible capital assets in 1919 at a price that, together with its operation, resulted in a net loss to it for that year. *Held,* that in so far as such net loss resulted from the sale of capital assets it may not be deducted from income for the year 1918 under the provisions of section 204 of the Revenue Act of 1918.

*A. L. Hopkins, Esq., H. B. Sutter, Esq.,* and *R. S. Doyle, Esq.,* for the petitioner.

*John D. Foley, Esq.,* for the Commissioner.

*Robert N. Miller, Esq., J. Robert Sherrod, Esq.,* and *Edward McCarthy, Jr., Esq.,* as *amici curiae.*

This is an appeal from the determination of a deficiency in income and profits taxes for the year 1918, in the amount of $141,294.31. The issues stated in the appeal are (1) whether the petitioner is entitled to a reasonable allowance for the obsolescence of tangible and intangible assets during the taxable years; (2) whether the Commissioner erred in refusing to allow the petitioner to offset

income for 1918 by an alleged net loss sustained in 1919; and (3) whether the petitioner may restore the amount of $70,000 to invested capital.

### FINDINGS OF FACT.

1. The petitioner is a corporation organized under the laws of the State of Illinois in February, 1893, with a capital stock of $500,000, fully paid up, and with its principal place of business at Chicago. All the capital stock was issued to Charles Shaffner and Edwin Meyers, for a certain brewery and its business at Chicago. The value of the tangible assets for which the stock was issued was $225,000, and the value of the intangible assets was $275,000.

2. The petitioner manufactured exclusively draught beer, known as "Manhattan Beer," and from the first was a successful and profitable concern. The volume of business done by the petitioner is illustrated by the following table of the number of barrels sold annually, the net tangible assets, and the net earnings as shown upon the books of the petitioner for each of the years from 1894 to 1898 and 1905 to 1919, inclusive.

| Year. | Barrels. | Net tangible assets. | Net earnings. |
|---|---|---|---|
| 1894 | 50,615⅜ | $225,000.00 | $62,015.32 |
| 1895 | 75,480⅞ | 225,000.00 | 67,686.00 |
| 1896 | 83,232⅝ | 272,686.00 | 131,886.76 |
| 1897 | 73,662½ | 415,882.53 | 92,105.68 |
| 1898 | 88,734½ | 402,500.00 | 80,000.00 |
| 1905 | 135,905½ | 671,250.00 | |
| 1906 | 150,579½ | | |
| 1907 | 165,474 | 832,500.00 | |
| 1908 | 174,430⅝ | 755,178.54 | 131,008.24 |
| 1909 | 179,980⅞ | 746,186.78 | 109,500.76 |
| 1910 | 191,766⅝ | 675,687.54 | 161,033.96 |
| 1911 | 193,514½ | 686,721.50 | 119,753.43 |
| 1912 | 190,252⅝ | 806,474.93 | 165,906.72 |
| 1913 | 219,651½ | 861,893.54 | 248,803.81 |
| 1914 | 213,191½ | 920,687.35 | 234,640.90 |
| 1915 | 213,265⅝ | 932,919.45 | 130,855.41 |
| 1916 | 210,773¼ | 881,519.59 | 174,663.03 |
| 1917 | 195,435 | 885,025.68 | 226,670.46 |
| 1918 | 143,636 | | |
| 1919 | 69,184 | | |

The average net value of tangibles used in the business for the period 1908 to 1917 was $813,228.49. The average net income for the period 1908 to 1917 was $170,283.57.

3. By reason of national prohibition legislation in December, 1917, affirmative action on the proposed constitutional amendment by many state legislatures during 1918, and congressional war-time prohibition legislation in November, 1918, the petitioner, believing that a large part of its brewery plant and property had then become obsolete and would be wholly obsolete on the effective date of the national prohibition amendment, charged off its books as of December 31, 1918, the amounts of $255,488.56 for obsolescence of its tangible assets, and $474,002.30 for obsolescence of its intangible assets,

including its good will, trade name, and trade brands, and deducted the amounts so charged off from its gross income in its income and profits-tax return for 1918. For 1919, the Commissioner allowed a loss of $347,533.83 on the sale of the petitioner's tangible assets, and determined a net loss of $138,986.34 for that year. This loss was computed, however, without restoring to the book value of the tangible assets the amount of $255,488.56 charged off the books in 1918 for obsolescence of tangibles or the amount of $474,002.30 taken for obsolescence of intangibles in the same year, but disallowed by the Commissioner as deductions from gross income for that year.

4. In the years 1903 and 1906, the petitioner charged off on its books for real estate the sum of $70,000. This sum was restored by the Commissioner in computing the loss on the sale of assets in 1919, but the Commissioner erroneously failed to restore this same amount to assets in computing invested capital for the year 1918.

5. Early in 1919, the petitioner made investigations with a view to utilizing its plant for some other business. It considered the availability of its physical property for use as a packing, cold storage, or vegetable drying plant, but found it suitable for none of these purposes. In February, 1919, it asked for and received bids for salvaging the plant. It received three bids in the amounts of $13,780, $15,000, and $20,000, respectively, and also a bid for wrecking the plant and removing the debris in the amount of $135,000, cost to the petitioner.

6. In the Chicago territory it was the custom of the brewery trade for purposes of purchase and sale, to arrive at the value of a brewery business from the annual sales of barrels of beer. On or about March 1, 1913, the value of a brewery operating at or near capacity and showing reasonable profits would be fixed at between $10 and $12 per barrel, and the value of the good will alone would be fixed at between $5 and $8 per barrel. The petitioner had many trade advantages and was a successful brewery. It produced only one grade of draught beer in a plant specially designed, planned, and constructed for that purpose. Advertising, together with the quality of its product, produced a large demand for this "Manhattan Beer," so that the brewery was able to operate at capacity and choose its customers. It sold its product exclusively to selected saloons within a short radius of the brewery, thereby reducing the usual transportation and delivery costs. The sales by barrels, the tangible assets and net earnings on or about March 1, 1913, were as follows:

| Year. | Barrels. | Tangible assets. | Net earnings. |
|---|---|---|---|
| 1912 | 190, 252⅝ | $806, 474. 93 | $165, 906. 72 |
| 1913 | 219, 651⅝ | 861, 883. 54 | 248, 803. 81 |

7. The capital stock of the petitioner, consisting of 5,000 shares of the par value of $100 each, was closely held. On February 3, 1905, Mr. Shaffner, the president, purchased 50 shares at $300 each from an estate. On January 25, 1907, he purchased 100 shares at $325 each. In 1912 he refused an offer of $350 per share for 1,500 shares.

8. The petitioner did not brew any new beer for sale after November, 1918, but, on July 1, 1919, it had on hand about 25,000 barrels of beer that had been brewed prior to November, 1918. This beer was not in a salable condition. It was dealcoholized to conform with the law, treated with a solution of sugar and water in order to sell it as "near beer," and blended with new brews in order to give it life. This venture was not a financial success. The total sales of beer from January 1 to July 1, 1919, and of the new product of near beer for the balance of the year was 69,184 barrels as compared with the average of about 200,000 barrels of beer for prior years.

9. On December 31, 1919, the petitioner sold all its tangible assets to the Malt Maid Co., an Illinois corporation, taking in payment $199,000, par value, of Malt Maid Co. stock, which it distributed to its stockholders. The Malt Maid Co. was capitalized in the sum of $200,000. The stockholders of the new corporation were the same as of the petitioner, with the exception of one share of stock, and so continued for approximately three years. After January 1, 1920, the new company manufactured and marketed cereal beverages in bottles and sustained losses as follows:

| Years. | Barrels sold. | Net loss. |
|---|---|---|
| 1920 | 23,967 | $29,211.60 |
| 1921 | 31,016 | 48,527.04 |
| 1922 | 24,896 | 18,156.41 |

The bulk of the business of the Malt Maid Co. was with a new line of customers and in goods sold in bottles instead of barrels. The business of the petitioner had been with a select class of saloons, while the new company dealt with delicatessens, grocery stores, and soda fountains. The name of "Manhattan Beer" was not sold to the Malt Maid Co. and was discarded and completely abandoned before the end of the year 1919.

10. The value of the plant and equipment of the petitioner on December 31, 1917, after taking depreciation, was $455,114.73, and the value of its intangibles, including good will, trade names and trade brands, at that date was $1,000,000.

OPINION.

LANSDON: The petitioner in this appeal is a brewery corporation which claimed a deduction for obsolescence for the calendar years 1918 and 1919, because of war-time and national prohibition legislation. The questions submitted in the appeal are:

(1) Whether the Commissioner erred in disallowing the deductions from gross income claimed by the petitioner for the calendar years 1918 and 1919 as obsolescence of its tangible and intangible assets, resulting from war-time and national prohibition legislation; (2) whether the Commissioner erred in failing to apply the net loss sustained by the petitioner in 1919 against the taxable income as determined by him for the calendar year 1918; and (3) whether the Commissioner erred by failing to include in invested capital for the calendar year 1918, $70,000 arbitrarily charged off the petitioner's real estate account in 1903 and 1906, but restored by the Commissioner in 1919. This latter claim is conceded to be correct by the Commissioner, and will not be further considered.

From the evidence offered it is proved that the petitioner was a prosperous going concern for over twenty years prior to March 1, 1913. By several sound methods of computation it was worth approximately $2,000,000 on December 31, 1917. It is also proved that by December 31, 1919, the value had dwindled to substantially a salvage value. The question for the Board to determine is whether or not the deduction for obsolescence proved as to facts and amounts, is such as to come within provisions of the law potent to furnish the relief claimed by the petitioner.

Obsolescence is recognized by statute. Section 234 (a) of the Revenue Act of 1918, provides:

That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\* \* \* \* \* \* \*

(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, *including a reasonable allowance for obsolescence.* (Italics ours.)

Obsolescence is defined in Webster's New International Dictionary as " state of becoming obsolete " and obsolete is defined as " no longer in use "; " neglected." Obsolescence can be distinguished from " wear and tear " in that wear and tear refers to the physical condition, while obsolescence refers to disuse and disappearing value arising from some extrinsic or external causes, such as progress in an art, change of style, or legislation. Machinery may be in good physical condition, but, by reason of change of style or progress in the art in which it is employed, be obsolete or in a state of obsolescence. It should be noted that obsolescence is defined as the state of *becoming*

obsolete, and does not necessarily imply that the disuse should be completed.

It must be conceded that legislation prohibiting the sale or use of certain manufactured products after a certain date may cause obsolescence of the asset used in such production. There being no further market for the product, the machinery and equipment for its manufacture, although in good physical condition, may become useless and obsolete. On the other hand, the machinery and equipment may be adaptable for the manufacture of some other product and still retain a part or even all of their useful value.

Let us see just what the situation was in 1918 and 1919 in respect to prohibition. On December 18, 1917, Congress passed a resolution submitting the prohibition constitutional amendment to the States. At that time thirty-three States, only three less than the number required for the ratification of an amendment to the Constitution, had state-wide prohibition, and large areas of the other States had prohibition by local option. It was then practically certain, therefore, that the amendment would be adopted. As early as January, 1918, some States that had been considered doubtful ratified the amendment, and, by January 15, 1919, the requisite number of States to make prohibition the law of the land had so acted. National prohibition was effective January 16, 1920. In the meantime war-time prohibition was in effect. On November 21, 1918, the manufacture of beer from cereals was prohibited and the sale thereof prohibited after June 30, 1919, except for export. "Food Control" acts were in force during the year 1918, restricting the use and transportation of cereals and other food products for beverage purposes.

The petitioner foresaw the doom of the brewing industry. The evidence discloses that early in 1919, it was seeking bids for salvaging its tangible property. In February, 1919, it received bids ranging from $13,500 to $20,000 for its plant. It then investigated the feasibility of converting its plant into facilities for a cold storage, vegetable-drying or packing-house business, but found it suitable for none of these uses. On July 1, 1919, it still had on hand 25,000 barrels of beer. This it converted into legal beverages by dealcoholizing and other processes, but failed to produce a commodity salable at profitable prices. In an additional effort to utilize the remaining value of its tangible assets, the stockholders of the petitioner organized another corporation with a capitalization of $200,000, which purchased the brewery plant for an amount that was a mere fraction of its former value. The new company did not purchase the trade name, "Manhattan Beer," which the petitioner abandoned in 1919, as of no value. It produced a nonalcoholic "near beer" which it sold in bottles to a class of customers who had never been patrons of the petitioner. This new venture, with a small capitalization, suf-

fered losses of approximately $20,000 for each of the next three years.

We have found that the value of the depreciable tangible property used by the petitioner in its trade or business was $455,114.73 at December 31, 1917. The evidence discloses that the petitioner ceased the manufacture of Manhattan Beer on November 20, 1918, and thereafter abandoned that trade name, and that on December 31, 1918, it charged off its books the amount of $255,488.56 on account of obsolescence of its tangible assets, and deducted such amount from its gross income in its income and profits-tax return for that year. The proof of the curtailment of the normal useful life of such assets by legislation already enacted or assured of enactment at an early date is clear and convincing. Allowances for obsolescence of tangible assets are authorized in section 234 (a) (7) of the Revenue Act of 1918. The Commissioner seems to have based his disallowance on the theory that the property continued to be used by the petitioner in a similar trade or business. The evidence refutes this contention. Even if the use of the assets in a similar trade or business is a bar against the allowance of obsolescence, as is contended, there is conclusive evidence in this record that these assets were not so used. In our opinion, the petitioner was legally entitled to a deduction at December 31, 1918, on account of obsolescence resulting from legislation.

It remains, then, for us to determine whether the amount so written off and deducted comes within the requirements of reasonableness as set forth in the law. There is no question as to the value of the property. The period of obsolescence extending from December 18, 1917, to January 16, 1920, is equally well established. Prohibition at an early date was almost a certainty. We are convinced that the amount of $255,488.56, determined by the petitioner, was a reasonable measure of the obsolescence of its tangible property during the year 1918. *Appeals of Michigan Lithographing Co.,* 1 B. T. A. 989; *Robert H. McCormick,* 2 B. T. A. 430; *Auditorium Co.* v. *Commissioner,* 5 B. T. A. 163.

Evidence offered and not disputed proves that intangibles consisting of good will, trade names, and trade-marks constituted a substantial portion of the value of the assets of the petitioner at March 1, 1918, and December 31, 1917. By advertising, fair dealing, and producing a single grade of product called " Manhattan Beer " the petitioner built up a large business with select customers in contiguous territory under conditions that enabled it to operate its plant at capacity and at a low cost. It created a demand for Manhattan Beer, and acquired a line of customers and business that was of substantial value over and above that of the tangible assets. We have found that the value of the good will of the petitioner at March 1,

1913, and at December 31, 1917, was $1,000,000. The same series of legislative acts that resulted in the obsolescence of the petitioner's tangible assets operated with equal or greater effect in reducing the value of its intangible assets. On December 31, 1918, the petitioner charged off its books the amount of $474,002.30 on account of the obsolescence of its intangible assets used in its trade or business, and, in its income and profits-tax return for that year, deducted from its gross income the amount so charged off. The Commissioner disallowed such deduction.

As authority for the deduction which it made from its gross income for 1918 on account of obsolescence of intangible assets, the petitioner relies on section 234 (a) (7) of the Revenue Act of 1918, which we quote *supra* in our discussion of obsolescence allowance for tangible property. It is its contention that the provision "A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence," should be read as if it had been written "A reasonable allowance for exhaustion, wear and tear of property used in the trade or business *and* a reasonable allowance for obsolescence." Its counsel argue that the word "including" simply adds another category to the allowable deductions, and that, as intangible property was owned by the petitioner and used in its business, a reasonable allowance for obsolescence thereof is clearly authorized by the statute. Counsel also maintain that inasmuch as taxpayers are allowed to make deductions on account of the exhaustion of patents, copyrights, leaseholds, and other forms of intangible property, it follows that similar deductions are due of right and law to this petitioner on account of the obsolescence of its good will, trade-marks and trade names.

The language of the statute seems to us to be clear, but, if it is not clear and must be interpreted, it is obvious that tribunals charged with that duty should not read into it any meaning not contemplated by Congress. The dictionary definition of the word "including," and many court decisions agree, almost without exception, that the word as used in the statute under consideration indicates enlargement of the meaning of the preceding terms rather than any addition thereto. Had Congress intended the provision cited to have the meaning contended for by the petitioner, it would have been easy to use the word "and," a term clearly indicating addition, instead of the word "including" which is so clearly a term indicating enlargement. We are of the opinion that the word "including" in the statutory provision cited does not establish an additional category as a basis for deductions from gross income, but merely enlarges the meaning of the words "exhaustion, wear and tear." *Blanck* v. *Pioneer Mining Co.*, 93 Wash. 26; 159 Pac. 1077, 1079.

The argument of the petitioner's counsel that if the statute does not authorize allowances for obsolescence of its intangibles, there is no authority for such allowance for patents, copyrights, and leaseholds, is not persuasive. The sole purpose of the provision in question is to permit the recovery of the cost or March 1, 1913, value of an asset during its useful life if it is used in the trade or business of its owner. Tangible assets deteriorate with use, and the measure of such deterioration is readily established by proof of certain facts. The law recognizes the possibility of exhaustion from other than physical causes and so provides that any allowances on account of wear and tear may include a reasonable allowance for obsolescence. Patents, copyrights, leaseholds, and similar intangibles do not suffer any physical deterioration in use, but, as their life is limited by contract, they decrease in value or become exhausted by the mere passage of years. Ordinarily the annual allowances for the exhaustion of such property is an aliquot part of their cost or capital value at March 1, 1913, for the number of years to elapse prior to the termination of the contract period, but in extraordinary conditions, as with tangibles, the allowance for exhaustion may be increased to include obsolescence.

From the foregoing it is obvious that in the instant appeal we must determine (1) whether this petitioner's good will, trade-marks and trade name are property used in the trade or business, and, (2) if so, whether it is subject to such exhaustion or wear and tear as will bring it within the statute and entitle its owner to a reasonable allowance for obsolescence.

We are of the opinion that it is now quite well settled that good will is property within the meaning of these statutes.

Good will is property recognized and protected by law as such, and capable of sale or other transfer from one owner to another in connection with a transfer of the property, business, or other rights to which it is incident. *28 Corpus Juris*, 730–731, citing many cases.

The Supreme Court of the United States in discussing the definition of property as used in the Revenue Act of 1918 said:

The general provision in § 12 (a), Second, is that the deduction from gross income shall include a reasonable allowance for the "exhaustion * * * of property." There is nothing to suggest that the word "property" is used in any restricted sense. *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364.

In support of this view, see also *Washburn* v. *National Wall-Paper Co.*, 81 Fed. 17; *Metropolitan Bank* v. *St. Louis Dispatch*, 149 U. S. 436; *Fox Co.* v. *Glynn*, 191 Mass. 344, 348; 78 N. E. 89.

The intangible property which the petitioner asserts is subject to obsolescence consists of good will, trade names, and trade-marks. Such assets have value, but that value is so interwoven with the

operation of the business, so much an inseparable part of the going concern to which they appertain, that the ascertainment of such value is difficult and their sale, except as component parts of a going business concern, is all but impossible. They are not subject to physical wear and tear incident to their use in the business operations of their owner, nor ordinarily is the period of their useful life limited either by contract or statute. No one would argue that such intangibles are subject to ascertainable annual losses due either to wear and tear or exhaustion even if their cost or capital value could be ascertained. In the light of the evidence and the law we are of the opinion that the petitioner is not entitled to the allowance claimed for obsolescence. since we hold above that such obsolescence is merely an enlargement of the meaning included in the words "exhaustion, wear and tear." *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626 (United States Circuit Court of Appeals, Eighth Circuit); certiorari denied, 273 U. S. 763.

In further support of its contentions, the petitioner alleges that it sustained a net loss in its business operations in 1919 in the amount of $347,533.83, and that, under section 204 of the Revenue Act of 1918, it is entitled to the deduction of such net loss from its taxable income for the year 1918. The record discloses the alleged net loss was sustained in the sale of the petitioner's plant and equipment to a successor corporation, and has been allowed by the Commissioner as a loss sustained during 1919, and disallowed as net loss for the purpose of reducing tax liability for the year 1918. The net loss statutory provision upon which the petitioner relies in support of this contention is as follows:

SEC. 204. (a) That as used in this section the term "net loss" refers only to net losses resulting from either (1) the operation of any business regularly carried on by the taxpayer, or (2) the bona fide sale by the taxpayer of plant, buildings, machinery, equipment or other facilities, constructed, installed or acquired by the taxpayer on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war; and when so resulting means the excess of the deductions allowed by law (excluding in the case of corporations amounts allowed as a deduction under paragraph (6) of subdivision (a) of section 234) over the sum of the gross income plus any interest received free from taxation both under this title and under Title III.

(b) If for any taxable year beginning after October 31, 1918, and ending prior to January 1, 1920, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount of such net loss shall under regulations prescribed by the Commissioner with the approval of the Secretary be deducted from the net income of the taxpayer for the preceding taxable year; and the taxes imposed by this title and by Title III for such preceding taxable year shall be redetermined accordingly. Any amount found to be due to the taxpayer upon the basis of such redetermination shall be credited or refunded to the taxpayer in accordance with the provisions of section 252. If such net loss is in excess of the net income for

such preceding taxable year, the amount of such excess shall under regulations prescribed by the Commissioner with the approval of the Secretary be allowed as a deduction in computing the net income for the succeeding taxable year.

(c) The benefit of this section shall be allowed to the members of a partnership and the beneficiaries of an estate or trust under regulations prescribed by the Commissioner with the approval of the Secretary.

In our opinion this provision of the statute is applicable only to net losses sustained in ordinary business operations. This seems to have been the intent of Congress, since it expressly included losses resulting from the sale of capital assets that had been acquired for producing materials for prosecuting the war. Had Congress intended that this provision should be all inclusive it would not have been necessary to specify any particular category of such assets. To the extent that the alleged net loss for 1919 resulted from the sale of the petitioner's tangible property it is not deductible from net income in 1918, under section 204 of the Revenue Act of 1918. *Auburn & Alton Coal Co.* v. *United States*, 61 Ct. Cls. 438.

On December 31, 1919, the petitioner sold for $199,000 tangible assets, the depreciated cost of which was $525,114.73 at January 1, 1918. For the purpose of determining gain or loss resulting from such conversion, we have held that the basic cost of depreciable property must be decreased or the sales price thereof must be increased by the amount of accrued depreciation at date of sale. *Appeal of Even Realty Co.*, 1 B. T. A. 355. In this appeal we have approved the amount of $255,488.66 as a reasonable allowance for obsolescence of the depreciable assets here involved for the year 1918, and the evidence and law upon which we have determined such allowance establish the right of the petitioner to a corresponding allowance for 1919, which practically wipes out the book value of such property at December 31 of that year. If the depreciation and obsolescence allowed and allowable in the amounts of $406,768.81 and $455,114.73, respectively, are added to the sales price, the result is $1,060,883.54. We are not able to determine whether the amount of $70,000, charged off the petitioner's real estate account in 1903 and 1906, is included in the value of tangibles at March 1, 1913, which the books of the petitioner show was $861,883.54. If not so included the true value of tangibles at that date was $931,883.54. The conversion of tangible assets at December 31, 1919, therefore, resulted in a gain of either $199,000 or $129,000.

The record disclosed that the Commissioner computed the net operating income of the petitioner for 1919 in the amount of $208,547.59, against which he allowed a deduction of $347,533.83, representing his computation of the loss sustained by the sale of capital assets, with a resulting net loss of $138,896.24, which he refused to subtract from income for 1918 under the provisions of the

taxing statute cited *supra*. Obviously these computations were made without giving the petitioner any benefit from deductions for obsolescence of depreciable assets to which we have held herein that it is entitled. It follows, therefore, that the net operating income for 1919 should be decreased by the amount of the obsolescence allowable, less the amount of ordinary depreciation allowed by the Commissioner for such year. Since the Commissioner has asserted no deficiency for 1919, we are concerned with the net operating income of that year only in relation to the petitioner's contention that it is entitled to a deduction from its taxable income for 1918, under the net loss provisions of the applicable taxing statute. We are without some of the facts necessary for the computations of the true operating income for 1919, and must leave this matter to be determined by proof in a proceeding under Rule 50.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

KORNER,[1] *Chairman*, dissenting: The decision of the Board in the matter of obsolescence of intangible property rests to a great extent on the decision in *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626. Reluctant as I am to express an opinion different from that of a court of such eminence, candor compels me to say that I am unconvinced by that decision. If the question involved is not hereafter considered by the Supreme Court the rule of that decision is the law, and as such I accept it. So long as that decision is the law and in so far as the instant case is governed by it, I accept the decision of the instant case. Beyond that my reason does not permit me to go and I dissent from the reasoning adopted by the majority of the Board in the decision on that phase of this case.

STERNHAGEN, dissenting: Try as I have, out of respect for the considered opinion of a majority of the Board, to bring my mind to accord with the prevailing views, I can not see that obsolescence of tangibles has been established by the facts found. The plant was, by reason of the sweep of prohibition, less useful at the end of the year 1918 than at the beginning and seemingly less valuable. But even assuming that the asserted reduction in value could be as accurately measured as the petitioner contends, this is not the way to measure the allowance for obsolescence which the statute provides for. Such allowance is the spreading of an expected obsoleteness reasonably over a period in which such obsoleteness can be foreseen, and it is applied by supplementing the allowance for depreciation in cases where the economic life is, by reason of this obsoleteness, reasonably demonstrated to be less than the physical life or legal duration of the property. In the present case, there was in 1918

---

[1] This decision was prepared during Mr. Korner's term of office.

no knowledge as to what use could be made of the property and it was not until 1919 that an investigation was begun to find out, and this brought forth the unaccepted bids for salvaging. Later another corporation was organized to take over the property for a new operation. However unsatisfactory this turned out to be, I can not see how it serves to prove the claimed obsolescence of $255,-488.56 in 1918. It seems almost unnecessary to say that in my opinion an allowance for obsolescence may be deducted when by evidence the forthcoming obsoleteness can be reasonably proved and its effect reasonably established, or that a loss may be deducted in a proper case when the property is abandoned, sold or otherwise disposed of, or its worthlessness proved. But the present case is not one of demonstrated loss and the facts do not, in my opinion, support the allowance claimed for obsolescence.

MURDOCK concurs in the above dissent.

TRAMMELL, dissenting: Since the trial of this case the Circuit Court of Appeals for the Eighth Circuit has decided in the case of *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626, that good will is not the subject of the obsolescence allowance provided by the statute.

Notwithstanding my great respect for and deference to the learned judge who rendered the decision of the court and the judges who concurred therein, I find myself unable to agree with the views expressed. A writ of certiorari has been denied by the United States Supreme Court in that case, but this does not as a matter of law amount to a decision of that court affirming the decision of the Court of Appeals. It amounted to a final disposition of the particular case but is not a precedent laid down by the Supreme Court which settles the law on the question involved. It was not a decision of the Supreme Court on the merits of the case. The decision of the Board was based upon the *Red Wing Malting Co.* case. I dissent from the decision of the Board in this case for the reasons hereinafter stated.

The pertinent portion of the statute involved is as follows:

SEC. 234 (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

*        *        *        *        *        *        *

(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.

For the purpose of this case it does not seem to me to be material whether the word "including," as used in the above section of the statute, means a new and additional deduction or whether, as stated by the court in the *Red Wing Malting Co.* case, *supra*, the phrase

"including a reasonable allowance for obsolescence" is "closely connected with and relates to the subject-matter of the other phrase of said subsection (7), and applies only to such property therein designated used in the business as is subject to exhaustion, wear, and tear." In any event, the statute includes in the deduction allowed on account of exhaustion, wear and tear an element, to wit, obsolescence, even though it is not considered a new kind of deduction. I think that the court in the *Red Wing Malting Co.* case, *supra*, correctly stated the purpose of Congress as follows:

It [Congress] was merely trying to provide the restoration of capital value of a depreciable asset over the period of its useful life by allowing something, known as obsolescence, as an additional element to exhaustion, wear, and tear.

It is clear that a deduction of an increased amount must be allowed whenever the element of obsolescence exists.

In revenue acts prior to the Revenue Act of 1918, the deduction on account of depreciation or exhaustion, wear and tear was included in the deduction allowed for losses. In the Revenue Act of 1918 a change was made and the deduction was disassociated from the loss provisions and is classified separately and distinctly from losses. Obsolescence being closely connected with and relating to the same subject matter and being included as an element of exhaustion, wear and tear, it is governed by the principles applicable to such deductions and not by the principles applicable to deductions with respect to losses.

Assets may have a life of twenty years but on account of new inventions and improvements, statutory requirements or for other reasons, they may become valueless and have to be abandoned at a much earlier date. It is this process of becoming inadequate or useless and the foreseen necessity of abandonment before the assets would become exhausted through the process of "exhaustion, wear and tear" that the deduction in the statute is provided to cover. Obsolescence is in fact exhaustion but not of a physical nature and by physical processes. It is the exhaustion of commercial usefulness or value before the expiration of physical usefulness. The statute simply recognizes a long recognized fact that under certain conditions which frequently exist capital values can not be returned to a taxpayer with respect to its depreciable assets by the time they have to be abandoned or lose their usefulness unless the element of obsolescence is considered and provided for.

On the question of the obsolescence of assets held by a railroad, the Supreme Court of New York, in the case of *People ex rel. Brooklyn Heights R. Co.* v. *State Board of Tax Com'rs.*, 127 N. Y. S. 825, said:

As surely as humanity travels to the grave, the machinery and equipment of a public service corporation travel toward the scrap pile. The plant and

structures depreciate in less degree but as certainly. This is ordinary depreciation. *But another form of depreciation in the case of properties here being valued takes place. The machinery or equipment, while still capable of years of service, becomes inadequate to do the work demanded—not only by the corporation, but by the law itself.* In the case particularly of electrical machinery, the type becomes obsolete by reason of invention, and increasing public demands frequently require in aid of safe and adequate service that the obsolete appliance or equipment give way to the new. *Property which in itself may be almost indestructible in the hands of a public service corporation may be required to be replaced by the requirements of the public* which the corporation serves. These requirements for change of plant, structure, and equipment and their replacement, can be and are made by the state itself. Some of these changes are capable of definite ascertainment. Others are not so readily ascertainable. Many of them, however, may be provided against for the future by setting apart from gross earnings a reasonable sum to create a reserve against the day when they shall come. This reserve, with amounts set apart for ordinary depreciation, go to amortize the capital of the company. (Italics ours.)

While the dictionaries define obsolescence as being " the process of going out of use " or " the state of becoming obsolete," and define obsolete as being " no longer in use—disused, neglected or discarded," which carries the idea that the property remains in existence but is not used or useful, I do not think that the statute should be construed by a narrow dictionary definition of a word. Here we are construing the statute and not merely defining a word. The purpose of the statute, together with conditions existing at the time of its enactment, the remedy sought to be afforded, the common use and understanding of words used and other things are to be considered. If the statute be construed, however, by such technical definition of the word " obsolescence," in my opinion even by that construction this taxpayer would not be deprived of relief. The taxpayer was forced to abandon its business, of which its good will was a part. This asset was abandoned when the business was abandoned. If good will was destroyed because of its forced abandonment, that is a matter that does not affect the principle involved. Certain kinds of tangible assets may be destroyed by abandonment. In my opinion, assets which can no longer be used in the trade or business, and as the result of abandonment are totally and completely destroyed, come within the scope of the provision to the same extent as assets which are merely abandoned or discarded but not destroyed. If it can be foreseen that assets will be destroyed as the result of legislation which prohibits their use, I do not think that the statute should be so construed as to prevent a deduction on account of the obsolescence thereof when, if the property remained in existence but without useful value and was abandoned, the deduction would be allowed. Under either view, however, the trade brands and trade-marks would come within the scope of

the provision. They were not destroyed. They remained in existence but were discarded and were without value. Their values, however, were closely intermingled and interwoven with the value of good will so that it can not be determined what portion of values attributable to intangible assets related to them. They were, in fact, a part of and included in good will and under the facts here are incapable of a separate valuation. The trade brands, trade-marks and good will, all together, however, had a definite and determinable life as the result of prohibition legislation.

It may be conceded that if good will, trade-marks and trade brands constitute a kind of property that is not subject to exhaustion, then the taxpayer can not prevail.

It is true that under ordinary circumstances and conditions this kind of property has an indefinite and indeterminable life and for this reason deductions on account of exhaustion thereof are not ordinarily allowable.

Conceding that good will under ordinary circumstances is not subject to exhaustion, it does not follow that it is never subject to exhaustion. It is not ordinarily, because under usual circumstances and conditions it continues and has an indefinite life. But there is nothing inherent in its nature that makes it impossible, under any circumstances, for its life to be made definite and limited in duration. It is, in any case, a question of fact to be determined whether its useful life for any cause arising before or after its acquisition has become limited in duration. If it can be established as a fact that good will has in a particular case become limited in duration, it seems clear that the provision of the statute allowing a deduction on account of exhaustion, including obsolescence, is just as applicable to such property as to any other property. Actual facts in the particular case before us are controlling over general principles or theories as to what the facts ordinarily are. If the taxpayer's good will did in fact exhaust or was becoming obsolete, the fact that good will ordinarily does not exhaust or depreciate seems to me to be immaterial. The statute is certainly broad enough in its terms to allow the deduction if the fact of obsolescence can be shown. It seems to me that this reduces the question to one of fact, that is, whether during the taxable year the taxpayer's intangible assets were in the process of becoming obsolete or losing their useful value.

The principle has long been recognized by the Treasury Department in connection with the intangible assets of brewers and distillers that, if they are in fact destroyed or become obsolete, deductions are allowable with respect thereto to the same extent as other property.

Under the Revenue Act of 1918 the Treasury Department published Bulletin F on the subject of depreciation and obsolescence. The caption page contains the following statement:

This bulletin contains information from which taxpayers and their counsel may obtain the best available indication of the trend and tendency of official opinion in the administration of the income and profits tax provisions of the Revenue Act of 1918, with respect to depreciation and obsolescence.

That bulletin, on page 14, contains the following statement:

Obsolescence is not ordinarily applicable in the case of intangibles but will be allowed in exceptional cases, as in the case of the discontinuance of a going business because of the exhaustion of its source of supply, where the cost of the good will, or its value as of March 1, 1913, if acquired prior to that date, can be definitely shown and the period of its obsolescence determined with reasonable accuracy.

On page 15 of the same bulletin appears the following statement:

Intangible assets of brewers, distillers, and dealers in liquor.—In Advisory Tax Board Memorandum 44 (Cumulative Bulletin, December, 1919, p. 133) it was held that distillers and dealers in liquor are entitled to make a deduction (based upon actual cost or fair market value as at March 1, 1913) from gross income, on account of depreciation or obsolescence of their intangibles, such as good will, trade-marks, trade brands, etc., such deductions being limited to assignable assets, the value of which has been destroyed by prohibition legislation.

Article 163 of Regulations 45, promulgated by the Treasury Department, is as follows:

Depreciation of intangible property.—Intangibles, the use of which in the trade or business is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses and franchises. Intangibles, the use of which in the business or trade is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner.

The Treasury Department, however, in all cases that have been called to my attention or which I have found, interpreted that regulation in accordance with the Advisory Tax Board Memorandum 44 as above quoted.

I have been unable to find any regulation or published ruling or decision of the Commissioner on the question of the obsolescence of intangible assets which is contrary to the opinion expressed in the above-quoted statement. There are rulings and opinions of the Commissioner to the effect that when a taxpayer, instead of abandoning his business on the effective date of prohibition legislation, continued in some other business in which the Commissioner considered

that the good will continued and was not destroyed, no allowance should be made on account of the obsolescence thereof. I am unable to find any case in which the Bureau of Internal Revenue has denied the right of brewers or distillers to the obsolescence of intangible assets which were destroyed, or were discarded or abandoned as the result of prohibition legislation, where their cost or value on March 1, 1913, has been established, until the decision of the District Court in the case of *Red Wing Malting Co.* v. *Willcuts*. I think that this uniform practice of the Bureau, representing the interpretation of the administrative body charged with the execution of the law, should be given great weight. *Edwards's Lessee* v. *Darby*, 12 Wheat. 206; *Brown* v. *United States*, 113 U. S. 568; *United States* v. *Falk*, 204 U. S. 143; *National Lead Co.* v. *United States*, 252 U. S. 140. The Revenue Acts of 1921, 1924, and 1926 contain the same language as was used in the Revenue Act of 1918, which had been construed in published rulings of the Treasury Department. This fact adds force and weight to the administrative construction of the Treasury Department. We should also not lose sight of the rule of construction of doubtful statutory provisions laid down by the United States Supreme Court in the case of *Gould* v. *Gould*, 245 U. S. 151. If there is doubt as to the proper construction, that doubt should be decided in favor of the taxpayer.

Good will has been defined as being the advantage or benefit which is acquired by an establishment beyond the mere value of capital stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or from celebrity or reputation for skill or affluence or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

See *Brown* v. *Benzinger*, 118 Md. 29; 84 Atl. 79; *Haugen* v. *Sundseth*, 106 Minn. 129; 118 N. W. 666; *Goetz* v. *Ries*, 123 N. Y. S. 433; *Johnson Co.* v. *Roberts*, 159 N. Y. 70; 53 N. E. 685; *Morgan* v. *Perhamus*, 36 Ohio St. 517; 38 Am. 607; Story on Partnerships, sec. 99.

Good will is property in and of itself. It is something that may be the subject of ownership, may be transferred and may be protected by law. The term "property" includes good will. See *Metropolitan Bank* v. *St. Louis Dispatch Co.*, 149 U. S. 436; *Coca-Cola Bottling Co.* v. *Coca-Cola Co.*, 269 Fed. 796; *Washburn* v. *National Wall Paper Co.*, 81 Fed. 17. Good will, however, has no existence except in connection with a going business and it may be bought and sold in connection with a going business as an incident or element of the business. *Camden* v. *Stuart*, 144 U. S. 104; *Sawilowsky* v. *Brown*, 288 Fed. 533.

The word " property," however, as used in the section of the statute here involved, is not used in any restricted sense. *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364. This being true all kinds of property must be held to be included in the deduction when obsolescence is shown as a fact to be actually taking place. Whether any particular kind of property ordinarily becomes obsolete is beside the question if it is shown in a particular case that it is reaching that point.

While good will has no existence separate and apart from a going business, it is recognized by the courts as an asset in the business. Frequently it is the most valuable and the greatest income-producing asset possessed. Businesses, including tangible property, are frequently purchased for the purpose of acquiring good will only. While good will is valuable only in connection with a going business and can not be separated from a business, it is, nevertheless, a separate element forming a part of the property and assets of an enterprise. It is capable of a separate valuation and may be protected separately by law. It may be entered separately on the books. It increases the total value of the business but does not increase the value of tangible assets segregated from the business. It is not indissolubly connected with specific tangible property. *Washburn* v. *National Wall Paper Co.*, *supra*. A business as a going concern consists of all its assets, tangible as well as intangible. The value of good will is not dependent upon the value of other assets. Good will is recognized in the Revenue Acts of 1917 and 1918 for the purpose of being included in invested capital when acquired for stock, without regard to the value of other assets, subject to the limitations provided in the statute and without any limitation when acquired for cash or other property. Intangible assets, including good will, are, in my opinion, used in the business in the sense of the word used in the statute. It is used like a lease, contract, franchise or similar property. In the case of *Henrici Co.* v. *Reinecke*, 3 Fed. (2d.) 34, the court said " that the leasehold was used in the trade or business is very evident." It is true that good will is not used like tangible assets are used. But neither are leases, contracts, patents, and other classes of assets. Leases, contracts, patents, and good will may be all the assets of a business, yet none of them are capable of physical use as other assets are. The statute, however, does not require that assets be used physically in order to come within the deduction provided for exhaustion, wear and tear, including obsolescence.

In the *Red Wing Malting* case, *supra*, the court used the following language:

We are satisfied there can be no wear or tear of good will, or exhaustion thereof by use, and, even should we assume that good will, separate and distinct from tangible property, is property used in the business, section 234

(a), subsection (7), of the 1918 Revenue Act limits the allowance for obsolescence to such property as is susceptible to exhaustion, wear, and tear by use in the business, and good will is not such property.

I am unable to agree with the learned court in the above quoted statement. I readily concede that good will is not subject to exhaustion, wear and tear, or obsolescence *by use* in a trade or business. The statute, however, does not require that the exhaustion, wear and tear, including obsolescence, be the *result of use* in the business but only that the assets subject to exhaustion, wear and tear, and obsolescence be *used* in the trade or business in order to come within the provision. The Revenue Act of 1918 is different from the prior revenue acts in that respect. The Revenue Act of 1913 provided for the deduction on account of the depreciation of property *by use, wear and tear*. The Revenue Act of 1916 provided for the deduction for the exhaustion, wear and tear of property *arising out of its use or employment in the trade or business*. The Revenue Act of 1918, however, does not contain such provisions but merely provides that the deduction on account of exhaustion, wear and tear, including obsolescence, will be allowed with respect to property *used in the trade or business*. If the deduction on account of the obsolescence of property is held to be allowable only in cases where it is becoming obsolete *by or on account of its use* in the trade or business, the effect would be to eliminate the deduction from the statute because property does not become obsolete *by* or *as the result of use*. Obsolescence is different from exhaustion, wear and tear in that it is the shortening of the useful life of an asset on account of economic conditions, new inventions, legislation prohibiting the use or other extraneous causes which have no connection with the physical use of the asset. It relates to economic or commercial life rather than physical life. If the deduction on account of exhaustion, wear and tear of assets, including obsolescence, be limited only to such assets as suffer exhaustion, wear and tear or obsolescence by or on account of the use in the business, it would amount to putting a restriction in the statute which, in my opinion, is not warranted by the language used. Certain assets become exhausted by the mere efflux of time. Leases, contracts, patents, and franchises are of this class, yet the deduction provided by statute is clearly broad enough to permit a deduction on account of the exhaustion of such assets. A deduction on account of the exhaustion of a mining lease was allowed in *Lynch* v. *Alworth-Stephens Co., supra.* A deduction on account of the exhaustion of a lease was allowed in the case of *Henrici Co.* v. *Reinecke, supra*, and in the case of *Kaufman-Straus Co.* v. *Lucas*, 12 Fed. (2d) 774, (C. C. A., Sixth Circuit, June 11, 1926.)

There being conflict between the decision of the District Court in the case of *Kentucky Tobacco Products Co.* v. *Lucas*, 5 Fed.

(2d) 723, decided April 17, 1925, and the case of *Kaufman-Straus Co.* v. *Lucas, supra,* decided by the Circuit Court of Appeals for the Sixth Circuit on June 11, 1926, in which Kentucky is situated, the decision of the Circuit Court of Appeals is paramount.

A lease may run for a definite period of years and it expires, not on account of its use, but by the passing of time. A patent has a definite life as established by law and that definite life becomes exhausted not by the use to which the patent is put. The amount of use does not affect the amount of the exhaustion which takes place. I think the statute should be construed according to its language, which does not provide that in order to come within the statute the exhaustion, wear and tear, including obsolescence, must be *by* or *on account of use* in the trade or business. The deduction is with respect to all assets *used* in the business when it is shown that they are approaching the end of their useful life as the result of exhaustion, wear and tear, and if the element of obsolescence is present the deduction should also include it, so that by the time they are abandoned as useless the capital value will have been returned out of earnings. It is true that the element of obsolescence is not always present either in the case of tangible or intangible assets. Whether it is, is always a question of fact to be established by evidence. Ordinarily good will, trade-marks and trade brands are not subject to exhaustion, including obsolescence. Under ordinary circumstances their life is indefinite and indeterminable. But ordinary circumstances and conditions did not obtain in the case of brewers when the prohibition amendment became effective, nor when it became a foregone conclusion that it would be passed. The good will that ordinarily had an indefinite life then had a definite and limited life. It was then known or reasonably expected that it would soon lose its value. If assets having a definite life are subject to exhaustion, I see no basis for holding that assets having no definite life when acquired yet whose life becomes limited and definite by subsequent events, are not to be included in the deduction. The fact that good will can not be sold except in connection with a going business is not sufficient reason for denying the right to a deduction on account of obsolescence thereof if it is, in fact, taking place. The business itself may become obsolete. If good will exists and can be sold only in connection with a going business, I see no reason why it may not be destroyed or rendered obsolete in connection with the business when the business is destroyed or rendered obsolete. That it can be destroyed is beyond question. It is a physical fact capable of demonstration. Good will, being property used in the business which may, under certain conditions and circumstances, lose its useful value, suffer exhaustion or become obsolete, a deduction is allowed by the

plain language of the statute on account of the exhaustion, including obsolescence thereof.

Being of the opinion that good will, trade-marks and trade brands may be the subject of the obsolescence deduction if established by evidence to have a definite and limited life, the question now arises as to whether under the evidence in this case the taxpayer is entitled to the deduction.

The taxpayer had and was using in its trade or business during 1918 good will, trade-marks and trade brands. They had a value as we have found on March 1, 1913, of $1,000,000. As the result of prohibition legislation the taxpayer was forced to give up and abandon its established business in which these assets were used and were income-producing factors. The good will which it had and used in its brewery business ceased to be of any value. While it might be presumed that if a going concern established a new business of a similar character or kind as the business formerly engaged in, then its good will, built up on account of its good reputation, the quality of its product or for other reasons, might remain and be an income-producing factor in the new business, still it is a presumption which may be overcome by evidence. In this case, as a matter of fact, the good will was destroyed or became obsolete. This being true, in my opinion the taxpayer has met the provisions of the statute which entitle it to the obsolescence deduction. I do not think that the statute should be construed as meaning only assets whose useful life is known at the time of acquisition to be definitely limited in duration. In my opinion, assets whose useful life is unknown and indefinite at the time acquired but becomes fixed and definitely limited subsequent to acquisition, are subject to the deduction allowed on account of exhaustion, including the element of obsolescence if that element is present.

The Board holds that with respect to tangible assets the obsolescence deduction is allowable. I see no valid distinction, as a matter of law, between the tangible and intangible assets. If, under the law and the facts of this case, obsolescence is allowable with respect to tangible assets I see no reason why it should not be allowed in the case of intangibles when it can be foreseen that their value will come to an end at a reasonably definite time. If it could be foreseen that the useful life of the tangible assets would come to an end as the result of prohibition legislation, it seems to me that the end of the useful life of intangible assets could be foreseen equally as clearly if not more so. One of the principle difficulties in the case of intangible assets is in determining the value with any degree of accuracy, but in this case the value as of the basic date is found as a fact. This value became a total loss as the result of prohibition. Since the statute makes no distinction as to the kind or nature of

property that is the subject of the obsolescence deduction, I see no authority to allow the deduction in the case of one kind of property and deny the deduction in the case of another kind when under the facts the intangible assets were destroyed as effectually as the tangible assets and the fact was just as clearly known in advance as it was known in the case of the physical assets, if not more clearly and definitely known.