APPEAL OF MORAND BROTHERS.

Docket No. 1351.   Promulgated November 7, 1927.

1. Obsolescence of intangible assets disallowed.
2. The deduction of an alleged loss of intangibles under section 234 (a) (4) of the Revenue Act of 1918, due to prohibition legislation, disallowed.

*James W. Good, Esq.*, for the petitioner.
*Briggs G. Simpich, Esq.*, for the Commissioner.

This is an appeal from the determination of deficiencies in income and profits taxes of $146,193.14 for 1918, and $7,051.69 for 1919. The deficiencies arise from the Commissioner's action in disallowing deductions from gross income for each of the years because of an alleged obsolescence of good will and intangible assets such as trademarks, trade-brands, etc., due to the adoption of war-time prohibition, the eighteenth amendment, and the resulting prohibition enforcement acts.

### FINDINGS OF FACT.

Morand Brothers began business as a partnership in 1884 in the City of Chicago, the business being the wholesaling and retailing of domestic and imported alcoholic beverages. On March 1, 1911, the business was incorporated as Morand Brothers, with a capital stock of $300,000. From and after the date of incorporation the accounts of Morand Brothers were kept on the calendar year basis. Prior to March 1, 1911, the books had been kept on a fiscal year basis ending September 30.

Prior to 1905 Morand Brothers had employed traveling salesmen. In that year, in response to a questionnaire from the firm suggesting a change in selling policy, which was heartily approved by the trade, sales by traveling salesmen were discontinued. Thereafter Morand Brothers sold directly to the customer by means of wholesale price lists. These lists were mailed to all customers and prospective customers.

The wholesale lists began circulation as a four-page pamphlet containing wholesale prices of domestic and imported stocks. Morand Brothers naturally pushed their own trade-brands and private stocks but listed other brands and importations which were carried in stock for the trade. The pamphlet increased in size and became very widely circulated. In 1908 the former four-page pamphlet had so increased in size and circulation that it was made a monthly publication and called "Morand Brothers Liquor Buyer's Guide." The June, 1909, edition of the Guide was a 52-page publication containing numerous two and three-colored cuts and printed in two-colored type. Liquor manufacturers and distillers had recognized it as the outstanding authority on wholesale liquor prices in the United States, and were buying considerable space in each edition to advertise their own goods. The publication was mailed to customers and prospective customers free of charge, the total circulation being between 20,000 and 30,000.

For a number of years the publication netted Morand Brothers a nice profit besides advertising and pushing their own goods, as shown by the following table of gross income, expense and net income:

| Year | Gross income | Expenses | Net income | Loss |
|---|---|---|---|---|
| 1910 | $14,594.94 | $7,814.16 | $6,780.78 | |
| 1911 (5 months) | 7,563.31 | 4,797.20 | 2,766.11 | |
| 1911 (10 months) | 17,431.71 | 7,916.23 | 9,515.48 | |
| 1912 | 14,698.94 | 4,671.44 | 10,027.50 | |
| 1913 | 19,508.64 | 12,018.19 | 7,490.45 | |
| 1914 | 17,885.46 | 14,100.12 | 3,785.34 | |
| 1915 | 12,903.98 | 13,849.01 | | $945.03 |
| 1916 | 9,167.86 | 10,096.55 | | 928.69 |
| 1917 | 8,562.02 | 10,617.07 | | 2,055.05 |
| 1918 to Mar. 31 | 911.72 | 1,010.63 | | 98.91 |

The gross income represented receipts from advertising space sold, while expense represents the cost of publishing. By June 1916, the Guide had grown to be an 84-page publication. The losses sustained after 1915 resulted from several reasons. Morand Brothers were pushing their own brands and private stocks, the advertising, particularly of foreign goods which had to be imported, fell off due to the war, and the increased size of the publication resulted in a corresponding increase in the cost of publishing. Morand Brothers Liquor Buyer's Guide was discontinued after March 31, 1918.

The principal customers of Morand Brothers were the Chicago department stores, saloons, and hotels. This business was solicited by telephone and by the wholesale price lists. The department stores bought large quantities of Morand Brothers' wines, and the petitioner established its own brands of wine and built up a very large business. The same was true of other brands of alcoholic beverages that Morand Brothers had fostered and established among the trade, such as Morand's Mellow Rye, Morand's Kentucky Bourbon, Morand's Private Stock, and various brandies and wines specialized in by the petitioner. Imported liquors and well known brands of manufacturers and distillers that sold by their trade names, were carried by the petitioner.

Morand Brothers sold the retail trade by means of wagons and retail stores. About 35 or 40 wagons were operated to sell to retail customers, while three retail stores were operated in Chicago. These three stores were owned outright and entirely by Morand Brothers, but operated under the name of A. L. Simmons & Co. A considerable amount of business was also secured outside of Chicago by correspondence and the wholesale price lists.

The volume of business done by Morand Brothers is shown by the sales for the period October 1, 1907, to December 31, 1922:

*Segregation of sales*

| Year | Beer, wine, and liquors | Soft drinks | Groceries | Totals |
|---|---|---|---|---|
| 1908 | $918, 053. 45 | $22, 929. 27 | None. | $940, 982. 72 |
| 1909 | 1, 353, 676. 61 | 25, 220. 17 | None. | 1, 378, 896. 78 |
| 1910 | 1, 802, 896. 35 | 25, 872. 78 | None. | 1, 828, 769. 13 |
| 1911 (5 months) | 915, 441. 48 | 9, 029. 41 | None. | 924, 470. 89 |
| 1911 (10 months) | 1, 667, 984. 75 | 31, 067. 71 | None. | 1, 699, 052. 46 |
| 1912 | 2, 072, 346. 35 | 27, 795. 37 | None. | 2, 100, 141. 72 |
| 1913 | 2, 167, 972. 34 | 29, 329. 10 | None. | 2, 197, 301. 44 |
| 1914 | 2, 038, 560. 15 | 23, 791. 20 | None. | 2, 062, 351. 35 |
| 1915 | 2, 164, 373. 63 | 21, 061. 27 | $846. 25 | 2, 186, 281. 15 |
| 1916 | 2, 265, 334. 09 | 35, 563. 09 | 4, 313. 95 | 2, 305, 211. 13 |
| 1917 | 2, 607, 499. 37 | 30, 087. 43 | 5, 210. 80 | 2, 642, 797. 60 |
| 1918 | 2, 153, 256. 00 | 43, 877. 43 | 6, 000. 60 | 2, 203, 134. 03 |
| 1919 | 1, 599, 551. 17 | 50, 598. 28 | 5, 111. 94 | 1, 655, 261. 39 |
| 1920 | None. | 144, 834. 01 | None. | 144, 834. 01 |
| 1921 | None. | 125, 970. 15 | None. | 125, 970. 15 |
| 1922 | None. | 123, 692. 13 | None. | 123, 692. 13 |

Due to the demand from the trade and particularly from department stores, Morand Brothers began handling ginger ale, mineral waters and other soft drinks. The soft drinks were handled as an accommodation and for the purpose of keeping its customers. The soft drinks were handled on a small margin which was barely sufficient to net a profit over actual costs. The groceries sold for the five years shown were principally coffee and tea.

On July 1, 1919, when war-time prohibition became effective, the petitioner discontinued all sales of liquor. The department-store business, hotel, saloon, retail stores, wagon, and all other sales had to cease. The petitioner did continue to sell ginger ale and soft drinks, but sustained substantial losses in so doing. The sale of soft drinks, where made to a department store that had been a customer for wines and liquors, had to be made to different departments and to new people. New contracts for the sale of soft drinks had to be made, as many of the former customers had gone out of business because of prohibition.

The books of Morand Brothers show invested capital for the years prior to March 1, 1913, and subsequent thereto as follows:

| | | | |
|---|---|---|---|
| 1908 | $297, 271. 14 | 1913 | $515, 223. 25 |
| 1909 | 346, 447. 11 | 1914 | 574, 908. 91 |
| 1910 | 397, 248. 25 | 1915 | 628, 677. 55 |
| 1911 (5 months) | 522, 005. 57 | 1916 | 640, 477. 51 |
| 1911 (10 months) | 422, 221. 75 | 1917 | 672, 854. 27 |
| 1912 | 452, 373. 50 | 1918 | 673, 091. 82 |

The amounts given for the fiscal years up to March 1, 1911, represent capital and surplus; after March 1, 1911, the amounts represent the total of capital stock, $300,000, plus the surplus at the end of the year.

Morand Brothers never carried a good will account on the books of the partnership or the corporation. The capital stock was issued for cash; no stock was ever issued for good will. The value of good will on March 1, 1913, was at least $250,000.

The petitioner alleged no specific value for good will in the petition but for the years 1918 and 1919 took certain deductions for alleged obsolescence of good will due to prohibition. The disallowance of these amounts as deductions by the Commissioner resulted in the deficiencies asserted for 1918 and 1919.

OPINION.

MORRIS: The issue presented by this proceeding is whether petitioner is entitled, as a matter of statutory right, to deductions from the income of the years under consideration for obsolescence of intangibles alleged to have been destroyed by prohibition legislation.

The question has already been decided adversely to the petitioner; and the determination of the respondent must be approved. *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626; *Appeal of Manhattan Brewing Co.*, 6 B. T. A. 952; *Appeal of Olt Bros. Brewing Co.*, 6 B. T. A. 974; *Appeal of Standard Brewing Co.*, 6 B. T. A. 980; *Appeal of Star Brewing Co.*, 7 B. T. A. 377; and *Frederick C. Renziehausen* v. *Commissioner*, 8 B. T. A. 87.

In a supplemental brief, petitioner presents the alternative proposition that it is entitled, under the provisions of section 234 (a) (4) of the Revenue Act of 1918, to deduct from income the loss, based on March 1, 1913, value, arising out of the destruction of its intangibles by prohibition legislation; although it contends that the loss should be spread over the years 1918 and 1919 in conformity with the same principle which would apply in the case of obsolescence. It is difficult to apprehend that the claimed deductions may be brought within the provisions of the statute upon which the petitioner relies. They provide for the deduction of only such losses as are "sustained during the taxable year"; and surely the facts do not support a finding that petitioner has sustained such a loss as to bring it within those provisions. A loss is sustained, within the meaning of the statute, only when it is a realized loss and is evidenced by a completed and closed transaction, *Appeal of A. J. Schwarzler*, 3 B. T. A. 535; *Appeal of Old '76 Distilling Co.*, 3 B. T. A. 1346; and *A. H. Fell* v. *Commissioner*, 7 B. T. A. 263; and until the investment is converted into terms of money by sale or other disposition, or its worthlessness otherwise demonstrated, there is neither loss nor gain and income is neither greater nor less. *Marigold Garden Co.* v. *Commissioner*, 6 B. T. A. 368. Petitioner continued in business after the advent of prohibition; and its good will continued as an inseparable part of the business. There could be no loss in respect of the good will until the business is terminated by sale or other disposition, and neither of these events occurred within the taxable years in question. Cf. *Frederick C. Renziehausen* v. *Commissioner, supra.* It is literally true that prohibition wholly destroyed the predominating and most lucrative feature of its business; and that after the advent of prohibition it carried on with a mere remnant of its former business, in new marts of trade. But the most favorable view to the taxpayer to be had in these circumstances is that the March 1, 1913, value of its good will was greatly diminished by prohibitory legislation; but a loss of this character is not within the statute.

It is useless to argue the equities of a case in which a taxpayer's business has been destroyed, either in whole or in part, by legislation. There are no equities save those that are founded upon the taxing statutes. Diminishing values, unrealized until converted into terms of

money, are an ever present and necessary evil in our complex economic structure. Nothing of value, whether tangible or intangible, is immune to fluctuations in market values. The particular cause is of no importance whatever; and losses in value resulting from the acts of the sovereign have no preferred standing under the taxing statutes. As was said in *Marigold Garden Co.* v. *Commissioner*, supra—

In considering the principle, the particular cause of the claimed loss matters little, if at all. Uselessness to a taxpayer does not determine a deductible loss any more when attributable to a statutory prohibition than when attributable to any other extraneous cause over which the owner has no control.

Out of the whole value of the good will at March 1, 1913, petitioner asks us to carve a lesser estate as assignable to the liquor business, and permit the deduction thereof as a loss in the years under consideration. This we may not do for reasons already stated; and even if we were to conclude, which we do not, that a part of the good will was severable from the whole and attached to the liquor business, there are no facts before us from which we could determine the value of that part. Cf. *Appeal of Acme, Palmers & DeMooy Foundry Co.,* 3 B. T. A. 1126.

It is quite possible that certain of petitioner's trade-marks and trade-brands, which were used exclusively in the liquor business, became obsolete with the advent of prohibition; but, as in the case of the good will, there are no facts before us from which we could determine whether or not the petitioner sustained a loss in respect of those assets.

Finally, if it were possible to hold that petitioner had sustained a loss in respect of its intangible assets, as the result of prohibitory legislation, which could be deducted from income for the purposes of the tax, such loss would necessarily be based upon cost or March 1, 1913, value, whichever is lower; and as there are no facts before us from which we could determine the cost of these intangibles, we would have been unable to find that petitioner actually suffered a loss.

> *Judgment will be entered for the Commissioner.*

Considered by TRAMMELL, MURDOCK, and SIEFKIN.