### APPEAL OF MARY M. DOWLING.

Docket No. 2394.    Promulgated April 22, 1927.

1. Obsolescence of stipulated value of certain tangible property
allowed.

2. Obsolescence of intangible property as a result of war-time
and national prohibition legislation is not deductible from tax-
payer's income for years in question.

*H. A. Mihills, C. P. A.*, for the petitioner.
*A. H. Fast, Esq.*, for the Commissioner.

This appeal is from a determination of deficiencies in income and
profits taxes for the years 1919, 1920, and 1921 in the respective
amounts of $1,549.10, $131.76, and $7,276.01. The only issue is
whether the taxpayer is entitled to certain deductions from gross
income for each of the taxable years on account of obsolescence of
tangible and intangible property resulting from war-time and Fed-
eral prohibition legislation.

## FINDINGS OF FACT.

1. The taxpayer is an individual residing at Lawrenceburg, Ky. Prior to the enactment of war-time prohibition legislation and the adoption of the Eighteenth Amendment to the Constitution of the United States, she was engaged in the business of manufacturing, storing, bottling, and selling whiskey. This business she inherited from her husband, deceased in 1903, who had been a distiller for about 40 years.

2. During the years involved in this appeal, the taxpayer owned two distillery properties. The first, hereinafter designated as Plant No. 41, is located at Tyrone, about four miles from Lawrenceburg, on a site difficult of access by wagon road and at considerable distance from any railway. The other property, hereinafter designated as Plant No. 59, is located at Lawrenceburg.

3. Plant No. 41 was used exclusively for the production of whiskey sold under the trade name of Waterfill and Frazier, which was first used in 1810. This whiskey was matured in wood in the plant storage warehouse, and none of it was ever bottled and offered for sale through retail trade until it was at least eight years old. The usual retail price of this whiskey was from $2 to $2.50 each for bottles containing one-fifth of a gallon. On March 22, 1904, the taxpayer entered into a contract for the sale of her entire output of Waterfill and Frazier Whiskey to Grommes & Ullrich, a firm of liquor brokers located at Chicago, for a period of twenty years at prices that assured profitable returns. This contract contained a provision which allowed the purchaser the privilege of cancellation at the end of any five-year period on written notice served on the taxpayer at least six months prior thereto. On December 14, 1917, convinced that the future of the whiskey business was hopeless as a result of prohibition agitation and legislation, Grommes & Ullrich notified the taxpayer of their desire and intention to cancel the above-mentioned contract at the termination of the five-year period ended March 22, 1919. The taxpayer accepted such notice and agreed to immediate cancellation without reference to the termination of the five-year period. Production of Waterfill and Frazier Whiskey was discontinued in 1916, and Plant No. 41 was thereafter used only for storage and bottling purposes.

4. Plant No. 59 produced "Old Dowling" and other brands of whiskey for sale to the general trade. This property was not utilized in manufacturing whiskey or spirits after 1917, in which year there was a production of 1,241 barrels. Subsequently the plant was used only for storage and bottling purposes.

79705°—28——62

5. The parties agree that on March 1, 1913, the taxpayer's tangible property had a cash value of $200,850, and that the depreciated value of such property on January 1, 1918, was $143,287.92. The parties further agree that the tangible property of the taxpayer, classified as to uses, had cash values as follows on March 1, 1913:

Facilities used exclusively for manufacturing whiskey_____ $47, 000
Buildings and plant for warehousing operation_____ 121, 500
Plant and equipment for bottling purposes_____ 32, 350

6. Since discontinuing the production of whiskey, the taxpayer has spent no money for the maintenance or upkeep of either buildings or machinery, except such amounts as were necessary to keep roofs in good condition while the buildings were in use for bottling and storage purposes. Since November 1, 1923, the effective date of legislation requiring the concentration of all whiskey in warehouses designated by the Government, the taxpayer's buildings have not been used, and since that date buildings and machinery of both plants have had only salvage or junk value. On May 4, 1925, a wrecking company offered $800 for all the buildings and equipment of Plant No. 59.

7. After she discontinued the commercial production of whiskey the taxpayer unsuccessfully endeavored in 1918 to obtain permission to continue the manufacture of whiskey for medicinal and other lawful purposes under Government supervision. She also made application to have her property designated by the Government as a concentration warehouse. This application was rejected. Subsequently other efforts were made to utilize the property for industrial purposes, but all such attempts failed because of the inaccessibility of the plants, and because, without large expenditures, the buildings and equipment were suitable only for the manufacture, storage, and bottling of whiskey and other spirits.

8. When the taxpayer discontinued production she had in storage about 22,000 barrels of whiskey owned by other parties, and since that time her only business operations have been the continued storage and the bottling of such whiskey. This business was discontinued as a result of Government concentration orders on November 1, 1923.

9. The average annual production of the Waterfill and Frazier brand for the five years preceding March 1, 1913, was 2,500 barrels of an average content of 46 gallons, and the manufacturing profit for the same period averaged 18 cents a gallon. Some time within the calendar year 1915, Grommes, of the firm of Grommes & Ullrich, offered to purchase the Waterfill and Frazier brand and Plant No. 41, and to pay therefor the amount of $500,000. The offer was not in writing, but was made personally to the taxpayer, who refused

it because she believed that the brand and property were worth more money than the purchase price offered. The value on March 1, 1913, of the taxpayer's intangible property was $250,000.

OPINION.

LANSDON: The facts with respect to the tangible property of the taxpayer used for distilling purposes are well established by the evidence. The parties have stipulated that at March 1, 1913, the aggregate value of buildings and machinery was $200,850; that depreciation sustained and allowed by the Commissioner from March 1, 1913, to December 31, 1917, was $57,562.08; and that the depreciated value of such assets, at January 1, 1918, was $143,287.92. Prior to January 1, 1918, the taxpayer discontinued the use of her property for distilling whiskey and thereafter none of the assets in question were used except for the purpose of storing and bottling goods theretofore manufactured.

On December 18, 1917, Congress adopted the joint resolution submitting the prohibition amendment to the Constitution to the States for ratification. In January, 1918, unexpected, favorable action on the amendment by several States indicated the certainty of early ratification by the requisite three-fourths of the States.

The effective date of the Eighteenth Amendment was January 16, 1920, and the Federal order requiring concentration of whiskey for storage purposes was promulgated November 1, 1923. These facts establish an obsolescence period extending from January 1, 1918, to November 1, 1923, during which the tangible property of the taxpayer used for distilling, bottling and storage purposes sustained obsolescence on account of Federal prohibition legislation.

The evidence discloses that at the termination of the obsolescence period the property in question had only a small salvage value. In 1925 an offer of $800 was made for Plant No. 59. We have no information as to the relative value of the two plants and believe that $2,000 is a fair estimate of their combined salvage value at the date of their final abandonment by the taxpayer for the purposes of her business. The period of obsolescence is 5⅚ years from December 31, 1917. We are of the opinion that the taxpayer is entitled to deduct aliquot parts of $143,287.82 for exhaustion, wear and tear, including obsolescence, in each income and profits-tax return made during such period, with due consideration for a salvage value of $2,000. *Appeal of Manhattan Brewing Co.*, 6 B. T. A. 952.

The taxpayer also claims the right to deduction from gross income for each of the taxable years on account of the obsolescence of intangible assets consisting of trade names and good will. We are convinced that such intangibles had a value of at least $250,000 at the

beginning of the period of obsolescence and that such value was lost during such period as a result of legislation. As the courts have held that intangibles of the nature here involved are not used in trade or business in a manner that subjects them to exhaustion, wear and tear and that obsolescence is merely an extension, or addition to the meaning of the words exhaustion, wear and tear, the taxpayer's contention on this point is denied. *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626; certiorari denied, 273 U. S. 763.

*Judgment will be entered on 10 days' notice, under Rule 50.*

STERNHAGEN dissents.