## W. H. HASKELL AND CHARLES M. HASKELL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6213. Promulgated July 22, 1927.

1. Claim for deduction for obsolescence of mill property, based on loss of value due to discontinuance of petitioners' business, disallowed.

2. Claim for loss of good will, due to discontinuance of petitioners' business, disallowed, no cost having been shown.

3. Petitioners suffered losses in 1919 from the operation of their business. *Held,* that such business losses must be reduced by income from other sources in determining the net loss which is to be used in determining taxable income for 1918.

*George R. Davis, Esq.,* and *Sigmond Sanger, Esq.,* for the petitioners.

*B. G. Simpich, Esq.,* for the respondent.

This is an appeal from the determination by the Commissioner of deficiencies in income tax for 1918 of $6,385.45 against Charles M. Haskell, and $6,240.70 against W. H. Haskell. It is alleged that the respondent committed error in computing the net income of the petitioner for 1919 in (1) refusing to allow as a deduction $29,010.40 claimed for loss of useful value of their plant, (2) refusing to allow as a deduction $89,061.80 as a loss of good will of their business, and (3) in reducing net losses for 1919 incurred in trade by the net income of the petitioner from interest and dividends on investments. A large part of the facts are stipulated.

### FINDINGS OF FACT.

The petitioners, W. H. Haskell and Charles M. Haskell, were during 1918 and 1919 equal copartners trading under the name of W. H. Haskell & Co., at Toledo, Ohio.

The partnership of W. H. Haskell & Co. was formed in 1887. They manufactured stock feed, hog, and chicken feed. In 1893 they built a plant and started the manufacture of brewers' grits. As a

by-product in the manufacture of these grits there was an offal which petitioners mixed with offal purchased from oatmeal mills and made into a dairy feed. They also bought damaged and salvaged grain and sold it as feed. A large quantity of grain damaged by fire was disposed of in 1910 by the petitioners and the Brooks Elevator Co., jointly. This transaction was carried as a separate account on the books of the firm on account of the interest therein of the Brooks Elevator Co.

The profits (without deductions of salaries to partners and exclusive of the profit from salvage of grain in conjunction with the Brooks Elevator Co.) and the invested capital of W. H. Haskell & Co. for the years 1909 to 1912, inclusive, were as follows:

| Year | Profits | Capital Jan. 1 |
|---|---|---|
| 1909 | $17,827.52 | $164,742.65 |
| 1910 | 44,069.25 | 162,708.95 |
| 1911 | 29,706.32 | 197,898.51 |
| 1912 | 36,939.02 | 165,305.53 |
| Total | 128,542.11 | 690,655.64 |

The profits from the salvage of grain in conjunction with the Brooks Elevator Co. in the year 1910 were $46,772.91, and the total allowance for salaries of partners for the four years as computed by revenue agent was $35,000.

A large portion of the business of the petitioners had been transacted in the States of Ohio and Michigan. During the year 1918, prohibition legislation in these States, the national war-time prohibition legislation, the curtailment of the use of corn products for brewery purposes by the United States Food Administration, and the assurance that the Eighteenth Amendment would be adopted, so affected the brewery business as to destroy the demand for brewers' grits. At the same time, there arose a demand for corn flour on account of war-time regulations of the United States Food Administration, and petitioners, after making some changes in their plant, began the manufacture of corn flour, which was continued until the Armistice in November, 1918, when the demand for corn flour ceased. It thereupon became evident to the petitioners that their business could not be profitably conducted, since the manufacture of feed was in a large measure incident to the manufacture of brewers' grits. They investigated the possibility of exporting corn flour, but were told that they could not get shipping facilities. In December, 1918, they determined to sell the plant and go out of business. The property was capable of being used for other purposes than that to which it was put by the partnership, including use as a flour mill.

The grain and flour business was depressed in December, 1918. The fair market value of the plant at that time did not exceed $30,000. The partners closed their books on December 31, 1918, by reducing the book value of the plant to that amount. In December, 1918, the petitioners began to liquidate the partnership. No further commitments were entered into by them. They had contracts for corn which they could not cancel. This was used up or sold on the market. The stock on hand was used up. The business was finally wound up and the mill closed in April, 1919. The plant was advertised for sale, no price being stated. Petitioners obtained an offer of $20,000, which was not accepted. No sale was made in 1919, but the plant was sold in 1920 for $40,500 net, and subsequently used by the purchaser in the manufacture of a special poultry meal in connection with an established business which he had for that product.

The profits (without deduction for salaries to partners) and the capital of the partnership for the years 1913 to 1918, inclusive, were as follows:

| Year | Profits | Capital Jan. 1 |
|---|---|---|
| 1913 | $39,547.74 | $195,107.21 |
| 1914 | 35,311.51 | 179,706.69 |
| 1915 | 25,427.43 | 174,934.22 |
| 1916 | 55,667.45 | 178,068.13 |
| 1917 | 110,941.76 | 206,697.54 |
| 1918 | 136,645.75 | 237,685.08 |
| Total | 402,541.64 | 1,172,198.87 |

The monthly sales for each of the years 1917, 1918, and 1919 of W. H. Haskell & Co. were as follows:

| | Sales | | |
|---|---|---|---|
| | 1917 | 1918 | 1919 |
| January | $101,003.03 | $71,363.80 | $24,739.27 |
| February | 92,183.77 | 125,589.53 | 21,766.27 |
| March | 97,456.73 | 181,626.21 | 12,218.22 |
| April | 127,790.62 | 249,191.08 | 6,365.94 |
| | | | 65,089.70 |
| May | 152,630.55 | 176,532.94 | [1] 4,772.27 |
| June | 185,779.85 | 141,724.90 | |
| July | 162,861.31 | 113,785.76 | |
| August | 41,491.71 | 75,781.26 | |
| September | 25,085.04 | 147,370.16 | |
| October | 22,024.25 | 104,919.73 | |
| November | 10,783.26 | 58,603.69 | |
| December | 18,768.65 | 36,258.34 | |
| Total | 1,037,858.77 | 1,482,747.40 | 69,861.97 |

[1] Sale of plant items.

The depreciated cost of the plant of W. H. Haskell & Co., as of December 31, 1917, was $62,116.21, and the total depreciation allowed by the respondent upon the plant for the taxable year 1918 is $3,105.81.

In 1919 W. H. Haskell & Co. suffered a net loss of $371.16, exclusive of any deductions for obsolescence of plant and good will.

The individual income for the year 1919 of W. H. Haskell, exclusive of any partnership profit or loss, was $7,700.66, computed as follows:

| | | |
|---|---|---:|
| Interest on corporation bonds containing tax free covenant | | $774.15 |
| Other income: | | |
| Interest on corporation bonds | $120.00 | |
| Interest on bank deposits, etc | 234.82 | |
| | | 354.82 |
| Total net income from above sources | | 1,128.97 |
| General deductions, taxes paid | | 607.64 |
| Net income | | 521.33 |
| Dividends | | 7,179.33 |
| | | 7,700.66 |

The individual income for the year 1919 of Charles M. Haskell, exclusive of any partnership profit or loss, was $3,792.62, computed as follows:

| | | |
|---|---|---:|
| Interest on corporation bonds containing tax-free covenant | | $2,590.00 |
| Other Income: | | |
| Interest on bank account, etc | | 730.27 |
| Total income from above sources | | 3,320.27 |
| General deductions: | | |
| Taxes paid | $357.62 | |
| Contributions | 570.00 | |
| | | 927.62 |
| Net income | | 2,392.65 |
| Dividends | | 1,400.00 |
| | | 3,792.65 |

In computing the share of the 1918 net income of the partnership of W. H. Haskell & Co., distributable to each of the petitioners, the Commissioner refused to allow a deduction of $29,010.40 claimed by petitioners for loss of useful value of the plant in 1918; he also refused to allow a deduction of $89,061.80 claimed as obsolescence of good will for 1918, and he reduced the net losses of each partner incurred in the partnership business in 1919 by the net income received from sources other than the partnership.

OPINION.

PHILLIPS: The first error alleged is that the Commissioner, in computing the distributive shares of the petitioners in the income of the partnership of which they were members, refused to allow a deduction of $29,010.40 claimed for loss of useful value of their plant. The evidence discloses that while the petitioners could no longer use this plant in the business in which they had been engaged prior to and during the taxable year, it was capable of use in other businesses and, while business conditions were such that they were unable to sell it in 1919, it nevertheless had a substantial value. The law authorizes the deduction of losses sustained but does not authorize the deduction of an anticipated loss due to fluctuations in value of property. While the evidence shows that the petitioners determined to discontinue operation of their business in 1918 and attempted to dispose of the building and found it impossible to secure a reasonable price at that time, these facts do not establish such a loss in 1918 as is required under the Income Tax Act before a deduction from income may be taken.

The second contention is that the partnership of which the petitioners were members should be allowed a deduction of an alleged loss of the good will value of their business. It is not contended that this good will was acquired by the petitioners at any cost to them and, this being so, no loss can be allowed. In *United States* v. *Flannery*, 268 U. S. 98; 5 Am. Fed. Tax Rep. 5373; and *McCaughn* v. *Ludington*, 268 U. S. 106; 5 Am. Fed. Tax Rep. 5376, the Supreme Court held that only actual losses sustained were deductible in computing the net taxable income and that the provision in the statute with respect to the March 1, 1913, value of property sold or otherwise disposed of served only to limit the actual loss and not to increase it. Here there was no actual loss and consequently no deduction may be allowed. In their brief, counsel for the petitioners contend for the allowance of a deduction in 1918 for the exhaustion or obsolescence of good will. Under subdivision (a) (8) of section 214, Revenue Act of 1918, any deduction upon such a basis must be disallowed upon authority of the decision of the Board in *Manhattan Brewing Co.*, 6 B. T. A. 952, following the decision of the Circuit Court of Appeals, Eighth Circuit, in *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626; 6 Am. Fed. Tax Rep. 6360.

It appears that in 1919 the partnership sustained a net loss, one-half of which is attributable to each of the petitioners. In determining whether the petitioners, as distinguished from the partnership, had sustained any net loss in 1919 which they might deduct in

determining taxable income for 1918, the Commissioner took into consideration the income received by each of the petitioners from investments. Petitioners claim this is error.

In defining the term "net loss" the Revenue Act of 1918 in section 204(a) provides:

That as used in this section the term "net loss" refers only to net losses resulting from either (1) the operation of any business regularly carried on by the taxpayer, or (2) the bona fide sale by the taxpayer of plant, buildings, machinery, equipment or other facilities constructed, installed or acquired by the taxpayer on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war; and when so resulting means the excess of the deductions allowed by law (excluding in the case of corporations amounts allowed as a deduction under paragraph (6) of subdivision (a) of section 234) over the sum of the gross income plus any interest received free from taxation both under this title and under Title III.

It is the contention of the petitioner that the phrase "when so resulting means the excess of the deductions allowed by law * * * over the sum of the gross income plus any interest received free from taxation both under this title and under Title III" refers only to income from the sources specified in clauses (1) and (2) of the paragraph. With this construction we can not agree. The term "gross income" is defined in section 213 of the Act and we see no reason to believe that the definition there given does not apply here. The two portions of the paragraph separated by a semicolon must be read together, and when this is done it seems clear that in determining whether a net loss has been sustained in 1919 which may be deducted in 1918, the taxpayer must establish not only that a loss occurred from the sources mentioned in clauses (1) and (2) of section 204(a) of the Act, but also that such losses were not offset by income from other sources during 1919. The latter part of this paragraph of the Act is so worded that it is only when a loss is sustained, considering all of the income of the taxpayer from all sources, and only to the extent of such loss, that he may shift a loss occurring under clauses (1) and (2) of the paragraph from 1919 to 1918. If the section were otherwise interpreted the taxpayer would be entitled in 1919 to deduct a loss under clauses (1) and (2) of the paragraph against nonbusiness income received in that year and also to deduct the same amount in determining net taxable income for 1918. It is not to be assumed that Congress intended to confer a double deduction and certainly, in view of the use of the words "gross income" and the definition of these words in the Act, such a construction would be unreasonable.

*Decision will be entered for the respondent.*

Considered by MARQUETTE and MILLIKEN.