*548 OPINION.
MoReis:
The first question raised by the pleadings relates to the disalloivance of additional salaries of $60,000 for 1917 or, in the alternative, for 1918. The petitioner entered the amount of the additional salaries and credited the several officers and employees affected b3^ the increase upon its books prior to the closing thereof for the fiscal year 1917, and claimed the deduction in the return for that year. As the year 1917 was disposed of by our prior opinion, the only question with which we are here. concerned is whether the additional salary is deductible for the year 1918. Although it be admitted that the informal agreement that additional compensation was to be paid, to whom, and a tentative understanding as to the amounts prior to the close of the fiscal year 1917 was insufficient authorization to permit the dqduction of the additional compensation for that year, ive are of the opinion that the amount thereof may not be deducted for 1918. The board of directors specifically voted the additional compensation for services performed during 1917. Section 234(a) (1) of the Revenue Act of 1918 permits the deduction in any taxable year, by a taxpayer on the accrual basis, of only the salary incurred during such year in carrying on the trade or business. Consequently, a payment during the year 1918 of an amount specifically as. salary for prior years, unrelated to the compensation for services for the year in which' paid, is not within the allowable deductions for 1918. Green Oil Soap Co., 3 B. T. A. 467; Vaughan & Barnes, Inc., 6 B. T. A. 1279.
*549 We hesitate to disturb a taxpayer’s determination of what constitutes a reasonable compensation to its officers and employees. The additional compensation in question was not awarded for services actually performed during the taxable year 1918, but specifically for their additional services, time and effort devoted to the business during 1917. By the same resolution which awarded the additional salaries in question, compensation was fixed by the directors for the year 1918, and it must be presumed that the amount decided upon was, in their opinions, reasonable compensation for that year. £n any event, we have no evidence to support the reasonableness of the sum of the additional salary in question and the regular salary voted for 1918 for the services actually rendered during 1918.
The third allegation of error urged by the petitioner is that the respondent erroneously excluded from its invested capital for the years 1917 to 1920 the cost of patents and rights relating to patents and the cost of certain contracts amounting to $88,216.91 and $220,628.75, respectively. The deficiency for 1917 having already been disposed of, we will concern ourselves only with the years subsequent thereto.
The respondent’s counsel directs attention to the fact that the question involved is not a positive exclusion from invested capital by the respondent, but his refusal to increase invested capital by restoring thereto certain items charged to expense in prior years. He contends that because those amounts were charged off to expense, and the assets acquired were not patent rights but permanent intangible assets, either as or in the nature of good will, the petitioner should not be permitted at this time to restore the amounts written off to its invested capital in toto. We can not agree with the position taken by the respondent. It makes no difference in our opinion that the petitioner erroneously charged those amounts off or that it exercised no rights under the patents acquired or that its purpose in securing said patents was the creation and maintenance of a monopoly in the grain-drying business, the fact remains that the patent rights were acquired and paid for and it appears to our satisfaction that thejf were of inestimable value in the conduct of the business and that the acquisition thereof was responsible in a great measure for the growing success of the business up to the advent of national prohibition. The patent values, therefore, which have been heretofore charged off, should be restored to invested capital during the taxable years in controversy to the extent of the proven costs less any amounts of normal exhaustion thereon ascertained from the life thereof as shown in our findings of fact herein. Goodell-Pratt Co., 3 B. T. A. 30; American Seating Co., 4 B. T. A. 649. In the case of those patents which have expired prior to the *550 taxable years and those which hare no proven life no amount should be included in invested capital. As to those contracts where the petitioner acquired patents, together with the covenants of the vendor to refrain from entering into a competitive business, and the patents have expired prior to the expiration of the covenant to refrain from a competitive business and said covenants are still in force during taxable years, there being no segregation of the consideration paid for the patent, on the one hand, and the said covenants, on the other, no value can be set apart for invested capital purposes.
Of the numerous contracts placed in issue by allegation of error numbered three, we shall first consider those acquired at the date of organization and recorded in the petitioner’s books of account at $106,768.75. The original book cost of those contracts was, as in the case of the patents hereinbefore discussed, written off to expense, $66,768.75 in 1908 and $40,000 in 1910. It is, therefore, the amount of the charge-off, or a portion thereof at least, which the petitioner seeks to restore to its invested capital.
The assets of the New Jersey Company were acquired by the petitioner in October, 1905, for its entire authorized capital stock of $500,000, and included in those assets were certain contracts entered into by the New Jersey Company which had been theretofor carried on its books of account at a cost of $176,000, which amount, however, was reduced to $106,768.75 when taken into the books of the petitioner. Those contracts will be discussed briefly in the order in which they have been set forth in our findings of fact herein.
The so-called Wigand contract, entered into between the New Jersey Company and Wigand, owner of the entire capital stock of the Brewers Grain & Feed Co., was for the purchase of said capital stock for the payment of $19,000, in consideration of the covenant of Wigand that he would, for a period of 25 years, refrain from engaging in or becoming associated with the business of manufacturing, drying, buying or selling wet brewers’ grain, or machinery appertaining to the drying and treatment thereof, in a certain restricted area, and in further consideration of the exclusive right and license to use a certain patent mentioned in said contract. That contract also provided for the purchase of certain presses specified therein or at the election of the said Todd to pay the sum of $5,000 in lieu thereof. The option was exercised and the $5,000 was paid in addition to the $19,000 provided for the purchase of the capital stock owned by Wigand, making the total consideration $24,000. Of the tangible assets acquired by the New Jersey Company in the transaction with Wigand, those which were usable had a value at that time of $2,500, exclusive of the value of the contract itself, and the remainder of the assets not usable were scrapped.
*551 In 1904 William S. Gordon, counsel for the New Jersey Company, entered into several agreements with parties named Schutte, Kern, Demmert, and Schmidt, by which the sums of $5,000, $145, $145, and $40,000, respectively, were paid to those parties for their covenants to refrain from engaging or becoming interested in or associated with the business of manufacturing, drying, buying or selling brewers’ or other wet or dried grains in a certain restricted territory.
The respondent contends, among other things, that no evidence of value at the date of acquisition of the contracts entered in the petitioner’s books of account at $106,768.75 is disclosed by the record. It is true that insufficient evidence was offered with respect to the National Feed Co. and Empire Dairy Feed contracts to justify the determination of value for invested capital purposes, but as to those contracts which we have discussed briefly in the opinion hereinabove, we disagree with the respondent. The Wigand transaction was consummated in March, 1905, and the Schutte, Kern, Demmert, and Schmidt contracts were consummated in March, 1904, and the various sums of consideration were then paid. The petitioner was organized and incorporated in October, 1905, at which time it issued its capital stock for the assets of said New Jersey Company. These contracts had formerly been carried on the books of the New Jersey Company at a cost of $176,000 and stock of the petitioner was issued therefor to the extent of only $106,768.75. The proximity of time when these various cash expenditures were made by the New Jersey Company to the organization of the petitioner and its acquisition of those contracts for its capital stock convinces us that the cost to it was not less than the amounts paid therefor by the New Jersey Company.
Having considered allegation of error numbered three herein with respect to patents and also contracts entered into by the petitioner’s predecessor, there remains for consideration the contracts entered into by the petitioner itself subsequently to organization.
In 1910 the petitioner entered into an agreement which resulted in the acquisition of stock of the Eastern Feed Co. in consideration of $45,000. Although the principal items contracted for in the acquition of the Eastern Feed Co. were the discontinuance of business by people connected with that company and the contracts which that company had entered into with brewers, it also acquired various tangible assets, consisting of certain items of machinery and equipment and eight horses, four wagons, harness, tools and equipment, etc., also a certain lease dated January 15, 1910. Of those tangible assets the petitioner took possession of and used the eight horses and four wagons, having a value of $100 each. The petitioner *552 was released from the lease acquired by it in consideration of the payment of $1,000, and it recovered $1,000 by way of salvage in scrapping the remaining assets acquired.
In 1910 the petitioner entered into an emplojunent agreement with one Peterson for a period of 10 years, in consideration of the payment of $5,000 in full, for all services rendered for that period, in which Peterson covenanted not to engage in a competing business during the tenure of his contract. The petitioner’s books of account show, however, that only $4,000 was paid on account of this contract, $2,750 in 1910 and $1,250 in 1911. The record does not explain the difference of $1,000-
In April, 1917, the petitioner entered into a contract with Central Feed Co., a competitor, for the purchase of that company’s business in New York City, including its good will, contracts, machinery and equipment, horses and wagons, and a contract with the Central Brewing Co. for the purchase of wet grain, in consideration of the payment of $75,000. The said Central Feed Co. covenanted not to again engage in a competing business in a certain restricted territory for a period of 25 years, and, furthermore, that it would dissolve and cease its corporate existence. It obtained the covenant of William Lowe, a stockholder and director of that company, not to engage in a competing business for a period of 25 years. Of the tangible assets acquired in that transaction the petitioner took possession of 4 driers, 2 presses, 3 or 4 horses and 2 trucks, all of which had a value of not to exceed $10,000.
At some time in 1909 the petitioner, having been threatened with serious competition from the Lembeck & Betz Eagle Brewing Co., one of the largest brewers in New Jersey, entered into a contract with that company, by which it covenanted that it would refrain from a competing business for a period of at least ten years, and the officers of that company also made similar covenants. The petitioner acquired a drier, installed by that company, which it turned over to one Caspar at a valuation of $10,000, in addition to paying the said Caspar $2,000 in cash. The entry recording the $65,000 consideration paid in the Lembeck c% Betz Eagle Brewing Co. transaction was made in the petitioner’s books in June, 1909. Said entry bore an explanation stating “Abandonment of grain drying by Lembeck & Betz Eagle Brewing Company.”
The record shows very clearly that the motivating cause for the acquisition of all of the contracts hereinbefore discussed, either by the petitioner or its predecessor, was not to acquire additional tangible assets or to broaden the field of its manufacturing activities, but to stifle and render impossible the recurrence of competition m the manufacture of feed from brewers’ grains, anc] it shows further *553 that, notwithstanding that the amounts paid as consideration for those various contracts were written off to profit and loss, the values remained the same as when they were entered into. That they were of immense value to the petitioner can not be doubted. We are, therefore, of the opinion that the proven costs of those various contracts, less normal exhaustion thereon, and the amounts of salvage or recovery from assets received therewith, should be restored to invested capital for the taxable years in controversy. Goodell-Pratt Co., supra, and American Seating Co., supra. Since the contract entered into in 1910 with Peterson was for his services for a period of 10 years, no value can be assigned thereto for invested capital purposes.
The petitioner contends that all of these contracts were of such a nature as to make them assets of permanent value, and, therefore, that they were not subject to exhaustion by lapse of time, for the reason that they removed competition from the field for such a period of time as to enable it so completely to entrench itself as to make the return of any competition from those sources exceedingly remote, if not impossible, and it requests that we apply the rule in Market Supply Co., 3 B. T. A. 841, to sustain this contention. The language used in that case was not intended as a general rule for all cases, and it can not be adopted as authority for the proposition urged by the petitioner. In that case the taxpayer by bill of sale acquired the right to occupy the store of one of its competitors as a tenant at will, the merchandise of the vendor, his contractors, the good will of his business, the right to use the vendor’s name for a period of two years, and his abstention from engaging in a like business for a period of 10 years, for which the taxpayer paid the sum of $6,000 in addition to the amount paid for the value of the inventory, which amount it claimed as a business expense for the taxable year 1918. The Board there was dissatisfied with the evidence adduced in substantiation of the claim for a loss and disallowed the same, declaring that the amount should be regarded as a “ capital expenditure of such indefinite duration that it can not properly be said to exhaust over any particular period.” The petitioner’s business was protected by the various contracts and agreements which it entered into for the periods of years specified therein. As each year passed the protection afforded by those contracts was diminished, and as the expiring date drew nearer the value became less because then, and only then, could the covenantors to the contracts proceed safely into the field of competition with the petitioner again. Of course some of the parties to these various contracts may predecease the duration thereof because of the lengthy period for which they are made, and in which event the petitioner is, of course, afforded permanent protec *554 tion from their competition. But simply because they are long-lived contracts and there is a possibility of death or other causes intervening which may render competition impossible, is no reason for saying that they have everlasting value. It might just as forcibly be argued that upon the death of a contracting party the contract itself ceases to be of any value whatsoever, for the reason that it ceases to be useful as a protective measure. These contracts are made for specified periods of time and we can attach no value to them beyond the period so specified and we, therefore, see no reason why they should not be exhausted in the normally accepted manner.
Having held that the foregoing patents and contracts are exhaustible assets, the petitioner is entitled to normal exhaustion thereon for the taxable years in controversy as contended for in allegation of error numbered four herein.
The fifth allegation of error urged by the petitioner is the failure or refusal of the respondent to allow a reasonable allowance fox-exhaustion, wear and tear, including a reasonable allowance for obsolescence of machinery and buildings during the taxable years 1918, 1919, and 1920. What the petitioner in fact seeks is a deduction from its gross income for obsolescence of its tangible assets due to prohibition. Section 234(a)(8) of the Revenue Act of 1918 provides:
(a) That in computing the net income of a corporation, subject to the tax imposed by section 230 there shall be allowed as deduction:
*******
(8) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.
We have described the tangible assets owned and operated by the petitioner during the taxable years in controversy in considerable detail in our findings of fact; therefore, a repetition here will serve no beneficial purpose. From the testimony adduced we are convinced that the buildings and machinery used by the petitioner were of such peculiar and special design as to render them unsuitable for other than the business of manufacturing feed from brewers’ grain, and, furthermore, that they could not and were not in fact readily converted to any other use except as indicated in the findings of fact. One witness characterized the business of the petitioner as a “ process,” that is, it took wet grain and put it through a process of drying, turning out a finished product and the machinery which it used was in sequence. That witness said in his testimony, “ There are elevators, conveyors, presses, and driers, more conveyors and bins and chutes, and the buildings have to be of a peculiar and special design to accommodate such a procedure of operation. Consequently, the buildings are not standard or regular in shape so that they could lend themselves to any other use.”
*555 During 1918 the Government restricted the quantity of grain used in the brewing of beer and, therefore, the output was materially reduced, resulting in a considerable decrease in the quantity of wet grain received by the petitioner from brewers. The supply of wet grain received during that year was less than one-half the amount normally received. There was a slight increase in 1919 over the quantity received in 1918, but after the advent of national prohibition, which became effective in January, 1920, there was a further decrease to 10 to 15 per cent, which condition has existed since that time. Prior to prohibition the output of beer in the Metropolitan District was 12,000,000 barrels annually, as compared with 1,500,000 to 2,000,000 barrels of so-called near-beer produced after prohibition. During the busy season from April to October, the petitioner’s New York plant, prior to prohibition, operated continuously day and night throughout the entire week, without shutdown, and during the slack season from November to March it operated for three 24-hour days consecutively. During the busy months since January, 1920, it has operated from five to six days a week of 8 hours duration and during the dull months from two to three days a week. The total tonnage of dry grains produced in the New York and Buffalo plants declined from 37,337 tons and 12,891 tons, respectively, in 1913, to 8,582 tons and 3,771 tons respectively, in 1927. In fact, the tonnage at the New York plant was reduced in 1920 to 6,212 tons, from 22,501 tons in 1919.
While the petitioner was not directly legislated out of business because of national prohibition, there can be no possible doubt but that its business was unquestionably dependent upon the brewing industry, which was in fact legislated out of business in so far as the manufacture of beer containing more than one-half of one per cent alcoholic content was concerned. Had the brewers not continued to manufacture so-called near-beer the petitioner’s business would no doubt have been compelled to cease operation entirely.
In Manhattan Brewing Co., 6 B. T. A. 952, where the question of obsolescence of both tangible and intangible assets, caused through the passage of the prohibition laws, was considered, the Board said:
It must be conceded that legislation prohibiting the sale or use of certain manufactured products after a certain date may cause obsolescence of the asset used in such production. There being no further market for the product, the machinery and equipment for its manufacture, although in good physical condition, may become useless and obsolete. On the other hand, the machinery and equipment may be adaptable for the manufacture of some other product and still retain a part or even all of their useful value.
Let us see just what the. situation was in 1918 and 1919 in respect to prohibition. On December 18, 1917, Congress passed a resolution submitting the prohibition constitutional amendment to the States. At that time thirty-three *556 States, only three less than the number required for the ratification of an amendment to the Constitution, had state-wide prohibition, and large areas of the other States had prohibition by local option. It was then practically certain, therefore, that the amendment would be adopted. As early as January, 1918, some States that had been considered doubtful ratified the amendment, and, by January 15, 1919, the requisite number of States to make prohibition the law of the land had so acted. National prohibition was effective January 16, 1920. In the meantime war-time prohibition was in effect. On November 21, 1918, the manufacture of beer from cereals was prohibited and the sale thereof prohibited after June 30, 1919, except for export. “ Food Control ” acts were in force during the year 1918, restricting the use and transportation of cereals and other food products for beverage purposes.
The petitioner foresaw the doom of the brewing industry. * * *
The respondent’s counsel contends that there is no definite evidence of record that the petitioner reasonably knew or believed prior to the fiscal year 1920 that any of its machinery or buildings would become obsolete in advance of their- ordinary useful life, and that therefore it is not entitled to a deduction for obsolescence because of the enactment of the prohibition law. While the evidence adduced in an attempt to prove the state of mind of the officers and directors of the petitioner prior to and during the years 1917, 1918, and 1919 is not the most convincing, we find other evidence of record offered, however, with respect to another issue in the case which conclusively shows, in our opinion, that the company’s officers and directors had a reasonable belief that prohibition in some form was just in the offing. In December, 1915, certain employment contracts were extended, by mutual consent of the parties, to December 9, 1920, with the understanding, however, “ that the term of said agreement may at the option of the company be terminated if a prohibition statute prohibiting the manufacture and sale of beer is enacted either by the Federal Government or by the State of New York.” Therefore, the evidence to the effect that in the spring of 1917 there was no thought in the minds of the officers of the petitioner that prohibition would ever affect the brewery business is clearly and unmistakably in error. Of course there was no definite knowledge until in or about January, 1919, just how brewers might be affected by the enactment of the prohibition law, nor indeed is a definite knowledge necessary. In December, 1917, Congress passed a resolution submitting the prohibition amendment to the Constitution to the States, at which time thirty-three States had already enacted state-wide prohibition laws and certain portions of other States had passed local option laws, and as we said in Manhattan Brewing Co., supra, “it was then practically certain, therefore, that the amendment would be adopted.” Naturally, all brewers hoped until the last that the business of brewing beer would not be affected, but *557 many business men were of the opinion that the manufacture of beer was ultimately doomed. We are satisfied, therefore, that this test has been adequately met by the evidence of record.
The petitioner alleges in its petition and the respondent admits in bis answer that the period during which obsolescence was in progress on account of the prohibition legislation was from January 1, 1918, to January 16, 1920.
We are of the opinion, therefore, that the petitioner is entitled to deduct obsolescence upon its buildings, machinery and equipment at those plants, the use of which was discontinued as a result of prohibition, namely, the Melrose, Newark, and Brooklyn plants. In computing said obsolescence, depreciation should be taken into consideration, and there should be deducted therefrom any and all amounts received by way of salvage or recoveries from the sale or disposition of machinery and equipment or buildings. No obsolescence should be allowed, however, with respect to the New York and Buffalo plants for the reason that they were not abandoned, nor were operations suspended thereat upon the advent of national prohibition, but those plants were continued in use and operation for the receipt of grains from brewers engaged in the manufacture of near-beer. While it is no doubt true that the earning power of those two plants was somewhat lessened because of prohibition, there is no showing that they became obsolete or valueless within the taxable years in controversy. See Tennessee Fibre Co., 15 B. T. A. 138; City Park Brewing Co., 10 B. T. A. 925; and George Wiedemann Brewing Co., 9 B. T. A. 792.
The sixth allegation of error herein pertains to the failure and refusal of the respondent to allow any amount for the exhaustion, wear and tear, including a reasonable allowance for obsolescence of patents, contracts, good will and other intangible assets. We have already decided that the patents and contracts in controversy were exhaustible assets and that the petitioner is entitled to normal exhaustion thereon for the taxable years in controversy and, therefore, the only remaining question for us to determine is whether the respondent erred in disallowing obsolescence of these three types of assets, namely, patents, contracts, and good will. The petitioner’s counsel, mindful of the decisions in Manhattan Brewing Co., supra, and Red Wing Malting Co. v. Willcuts, 15 Fed. (2d) 626, in which it was held that good will was not the subject of obsolescence and, therefore, not deductible in the computation of net taxable income, has expressed the hope that the Board, if convinced by his argument, would reverse itself. We have considered the arguments presented in the light of the testimony adduced, and are constrained to *558 say that we can find no justification for a reversal of our former decision in the matter.
With respect to the obsolescence of patents and contracts we fully realize that the valúes thereof were reduced to some extent because of the advent of prohibition, but diminution in value while the asset continues in use is not a proper basis for obsolescence. We said in the Yough, Brewing Co. case, 4 B. T. A. 612, speaking of the petitioner’s plant there, “ The fact that it was not operated to full capacity is not sufficient evidence that it was then obsolete,” and in City Park Brewing Co., supra, we said “ If the facilities are being put to any use at all the very opposite of the state of obsoleteness is indicated.” Had all of the petitioner’s plants ceased operation because of the enactment of prohibition laws, it would be comparatively simple, all other factors being present, to say that the contracts at least became worthless for the reason that all protection sought thereby would then have become absolutely useless. As to the patents, however, it would not be so simple as in the case of the contracts, in the absence of a showing on the part of the petitioner, which it has not done, that those patents had no salable value outside of the industry in which the petitioner was engaged. The petitioner has shown to our satisfaction that the machines used by it were of such a peculiar design and style that they were not readily adaptable to other uses, but the patents acquired by the petitioner cover such a wide field of invention that there may be some which might be converted to other fields of industry. Or, on the other hand, had the petitioner attempted to show that those brewers with which it contracted to supply it with grain had been forced out of business because of national prohibition and that they themselves had ceased operation, proper segregation might be made of those contracts and a deduction for obsolescence determined. As the matter now stands, we have a great number of contracts, some of which we are reasonably positive are still in force and effect, while others we have a reasonable belief are not in effect, but which are and which are not, we can not determine from the record. The petitioner’s New York and Buffalo plants continued in operation after the prohibition law, and we presume are. still in operation; therefore, while the patents and contracts have been reduced in value, because the same amount of protection was not required after the closing of the other three plants, they, except as to those which have expired by their limitations, were still in force during the taxable years and just as effective as ever, and were affording the same protection originally sought through the acquisition thereof except in a lesser degree. We must, therefore, conclude *559 that a basis for a determination of obsolescence has not been established and that the findings of the respondent in this particular are sustained.
The seventh issue herein was raised by motion of the respondent’s counsel at the hearing, which is that the deficiency should be increased because of the erroneous overstatement of the Buffalo assets by $12,155.83, and a consequent overstatement of invested capital. We have found from the record that there was an overstatement of the petitioner’s surplus for the fiscal years 1918, 1919, and 1920 by the amount of $12,155.83. Therefore, the error complained of should be corrected and the deficiency adjusted accordingly.
Issue numbered eight herein, affirmative allegation of the respondent, is that he should exclude from invested capital 12/17 of $38,000 for the fiscal year ended September 30, 1918, and 13/17 of that amount for the ensuing fiscal year representing that portion of the so-called Bush patent rights which had already expired during those years. It appears from the record that the Bush patent rights were acquired with the original assets taken over by the petitioner from the New Jersey Company in October, 1905, and that they were thereupon entered upon the petitioner’s books of account at a cost of $39,000. In 1908 the petitioner charged $38,000 and in 1909, $999 of that amount to expense, leaving $1 as the nominal cost of said patent rights on the books of account. In the respondent’s determination of the deficiencies in controversy he restored $38,000 of the amount so written off to the petitioner’s assets, and accordingly increased its invested capital by that amount, which was clearly an error. The patent having been acquired in 1905, at least 12 years of its life had been spent in 1917 and likewise 13 years in 1918. Consequently the amount restored by the respondent should have been reduced by the exhaustion occurring during those 12 and 13 years, respectively.
The petitioner agreed to the foregoing adjustment provided it be entitled to deduct exhaustion for the fiscal years ended September 30, 1918, and 1919, based upon the valuation of $38,000, and moved to amend its petition as set forth in allegation of error numbered nine herein. Whether the petitioner is entitled to any exhaustion thereon at all during the fiscal years 1918 and 1919 we do not know, for the reason that the record is absolutely silent as to the year in which the Bush patent rights were granted and, consequently, the true life thereof can not be determined for the purpose of exhaustion. For all we know the patent may have expired prior to one, or possibly both of the taxable years, in which event no exhaustion would be allowable. Having alleged that it was entitled to deduct exhaustion for the years in question, it was incumbent upon the pe *560 titioner to prove the basis upon which such exhaustion might be computed, and having failed to do so it has not sustained the burden of proof.
Reviewed by the Board.

Judgment will be entered under Rule 50.